

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1995

# Spellman v. Meridian Bank

Precedential or Non-Precedential:

Docket 94-3203

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Spellman v. Meridian Bank" (1995). *1995 Decisions*. Paper 322.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/322

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 94-3203

———————


I. ORRIN SPELLMAN, on behalf of himself
and all others similarly situated

v.

MERIDIAN BANK (DELAWARE), and its
successor in interest Mellon Bank (DE);
MELLON BANK, (DE) N.A.

                    I. Orrin Spellman, individually
                    and on behalf of the class of
            all
                    others similarly situated,

                            Appellant

------------------------------------------


———————

No. 94-3204

———————

ERIC A. GOEHL

v.

MELLON BANK (DE)

                    Eric A. Goehl, individually and
                    on behalf of the class of all
                    others similarly situated,

                            Appellant

----------------------------------


1

VIRGINIA AMENT, individually and on
behalf of all others similarly situated

v.

PNC NATIONAL BANK, a national bank
(D.C. Civil No. 92-cv-244)


SUZANNE CAPLAN, individually and on
behalf of all others similarly situated

v.

MELLON BANK (DE), N.A.
(D.C. Civil No. 92-cv-302)


SARA J. SZYDLIK; DONALD R. SZYDLIK, for themselves
and on behalf of all others similarly situated

v.

FIRST OMNI BANK, N.A.
(D.C. Civil No. 92-cv-330)

BARBARA S. THOMPSON, individually and on
behalf of all others similarly situated

v.

MARYLAND BANK, a national bank
(D.C. Civil No. 92-cv-346)

Virginia Ament, Suzanne Caplan,
Sara J. Szydlik and Donald R. Szydlik,
Barbara S. Thompson, individually
and on behalf of the respective
classes they represent of all others
similarly situated,

Appellants

------------------------------------------

—————————

No. 94-3216

—————————

DAVID A. TOMPKINS, individually and
on behalf of all others similarly situated

v.

AMERICAN GENERAL FINANCIAL CENTER
(D.C. Civil No. 92-cv-375)


DONALD R. SZYDLIK, individually and
on behalf of all others similarly situated

v.

ASSOCIATES NATIONAL BANK (Delaware)
(D.C. Civil No. 92-cv-1025)

David A. Tompkins and Donald R. Szydlik,
individually and on behalf of the
respective classes they represent of
all others similarly situated,

Appellants

_____

—————————

No. 94-3217

—————————


KATHLEEN A. DEFFNER, individually and
on behalf of all others similarly situated

v.

CORESTATES BANK OF DELAWARE, N.A. a national bank
and HOUSEHOLD BANK, a federal savings bank
(D.C. Civil No. 92-cv-0398)


BARBARA BARTLAM, individually and
on behalf of all others similarly situated

v.

4

BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION,
a national banking association
(D.C. Civil No. 92-cv-1427)

Barbara Bartlam and Kathleen A. Deffner,
individually and on behalf of the
respective classes they represent of all
others similarly situated,

Appellants

----------------------------------------

_____

No. 94-3218

_____


DAVID A. TOMPKINS, individually and
on behalf of all others similarly situated

v.

THE CHASE MANHATTAN BANK (USA),
a Delaware Chartered Bank

David A. Tompkins, individually
and on behalf of the class of all
others similarly situated,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action Nos. 93-cv-868, 93-cv-878,
92-cv-244, 92-cv-302, 92-cv-330, 92-cv-346,
92-cv-375, 92-cv-1025, 92-cv-398,
92-cv-1427 & 92-cv-714)
_____

Argued on February 2, 1995

Before:  SCIRICA, ROTH and SAROKIN, Circuit Judges


(Opinion Filed December 29, 1995)


5

Michael D. Donovan, Esq. (Argued)
Chimicles, Jacobsen & Tikellis
361 West Lancaster Avenue
One Haverford Centre
Haverford, Pennsylvania 19041

Michael P. Malakoff, Esq. (Argued)
Malakoff, Doyle & Finberg
The Frick Building, Suite 200
Pittsburgh, Pennsylvania 15219

       Attorneys for Appellants

Alan S. Kaplinsky, Esq.
Burt M. Rublin, Esq.
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, Pennsylvania 19103-7599

            Attorney for Appellees,
            Meridian Bank (Delaware) and its
            successor in interest Mellon Bank (DE);
            American General Financial Center;
            The Chase Manhattan Bank (USA)

Arthur R. Miller, Esq. (Argued)
228 Harvard Law School
Langdell West
Cambridge, Massachusetts 02138

            Attorney for Appellees,
            Mellon Bank (DE), N.A.;
            First Omni Bank, N.A.;
            PNC National Bank;
            American General Financial Center;
            Associates National Bank (Delaware);
            Household Bank, F.S.B.;
            Bank of America National Trust
            & Savings Association;
            The Chase Manhattan Bank (USA)

Daniel I. Booker, Esq.
Thomas L. Allen, Esq.
Troy Rivetti, Esq.
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, Pennsylvania 15219-1886

       Attorneys for Appellees,
       Mellon Bank (DE), N.A.;
       First Omni Bank, N.A.

Christopher R. Lipsett, Esq. (Argued)
Ronald J. Greene, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037-1420

       Attorneys for Appellees,
       PNC National Bank;
       CoreStates Bank of Delaware, N.A.;
       Household Bank, F.S.B.


Richard J. Urowsky, Esq.
Sullivan & Cromwell
125 Broad Street
New York, New York 10004

       Attorney for Appellee,
       Maryland Bank


Jack C. Auspitz, Esq. (Argued)
Morrison & Foerster
1290 Avenue of the Americas
New York, New York 10104

       Attorney for Appellee,
       Associates National Bank (Delaware)


Samuel W. Braver, Esq.
Buchanan Ingersoll Professional Corporation
600 Grant Street, 58th Floor
Pittsburgh, Pennsylvania 15219

       Attorney for Appellee,
       CoreStates Bank of Delaware, N.A.

Kevin P. Lucas, Esq.
Manion, McDonough & Lucas
600 Grant Street, Suite 882
Pittsburgh, Pennsylvania 15219

        Attorney for Appellee,
        Household Bank, F.S.B.


Richard R. Nelson, II, Esq. (Argued)
Cohen & Grigsby
625 Liberty Avenue
2900 CNG Tower
Pittsburgh, Pennsylvania 15222-3115

        Attorney for Appellee,
        Bank of America National Trust
          & Savings Association


Michael F. Crotty, Esq.
American Bankers Association
1120 Connecticut Avenue, N.W.
Washington, D.C. 20036

        Attorney for Amici Curiae Appellees,
        American Bankers Association,
        American Financial Services Association,
        Consumer Bankers Association,
        Delaware Bankers Association,
        New Jersey Bankers Association, and
        Pennsylvania Bankers Association


Marsha Kramarck, Esq.
Delaware Department of Justice
820 North French Street
Wilmington, Delaware 19801

        Attorney for Amicus Curiae Appellee,
        Delaware State Bank Commissioner


Felecia A. Rotellini, Esq.
Office of Attorney General of Arizona
Antitrust Division
1275 West Washington
Phoenix, Arizona 85007

                    Attorney for Amicus Curiae Appellee,
                    Arizona Superintendent of Banks
Gary L. Newport, Esq.
Office of Financial Institutions
8401 United Plaza Boulevard, Suite 200
Baton Rouge, Louisiana 70809

                    Attorney for Amicus Curiae Appellee,
                    Louisiana Commissioner of
                       Financial Institutions


Lee Fisher, Esq.
Office of Attorney General of Ohio
30 East Broad Street, 17th Floor
Columbus, Ohio 43215

                    Attorney for Amicus Curiae Appellee,
                    State of Ohio


Mark E. Barnett, Esq.
Office of Attorney General of South Dakota
500 East Capitol Avenue
Pierre, South Dakota 57501-5070

                    Attorney for Amicus Curiae Appellee,
                    State of South Dakota


Jan Graham, Esq.
Bryce H. Pettey, Esq.
Office of Attorney General of Utah
50 South Main Street, Suite 900
Salt Lake City, Utah 84144

                    Attorneys for Amicus Curiae Appellee,
                    Utah Commissioner of Financial Institutions


G. Stewart Webb, Jr., Esq.
Venable, Baetjer & Howard
2 Hopkins Plaza
1800 Mercantile Bank & Trust Building
Baltimore, Maryland 21201-2978

                    Attorney for Amici Curiae Appellee,
                    MasterCard International Incorporated and
                       VISA U.S.A. Inc.


11

Douglas E. Walther, Esq.
Office of Attorney General of Nevada
198 South Carson Street
Carson City, Nevada  89710

> Attorney for Amicus Curiae Appellee,
> Nevada Division of Financial Institutions

OPINION OF THE COURT

ROTH, Circuit Judge.

These eleven consolidated[0] actions were brought by concerned Pennsylvania
believed that they were being charged excessive fees and interest on their credit c
and that these charges violated Pennsylvania consumer protection laws.  None of the
defendants are Pennsylvania lending institutions.  The cases were all brought in
Pennsylvania state courts and then removed by the defendants to the federal system.

---

[0]     The eleven actions which are consolidated before us were filed as class a
complaints, but the actions have not been certified as class actions.  Ament v. PNC
Bank, 849 F. Supp. 1015, 1017 (W.D. Pa. 1994).

[0]     The individual cases are:  Spellman v. Meridian Bank (DE), No. 94-3203 (M
Bank is a Delaware chartered bank insured by the F.D.I.C. and its successor in inte
Mellon Bank, is a national bank located in Delaware; district court docket numbers
3860, 93-868); Goehl v. Mellon Bank (DE), No. 94-3204 (Mellon is a national bank lo
in Delaware; district court docket numbers 92-2547, 93-878); Ament v. PNC Nat'l Ban
94-3215 (PNC is a national bank located in Delaware; district court docket number 9
Caplan v. Mellon Bank (DE) N.A., No. 94-3215  (Mellon Bank is a national bank locat
Delaware; district court docket number 92-302); Szydlik v. First Omni Bank, N.A., N
3215 (First Omni is a national bank located in Delaware; district court docket numb
330); Thompson v. Maryland Bank, No. 94-3215 (Maryland Bank is a national bank loca
Delaware; district court docket number 92-346); Tompkins v. American Gen. Fin. Ctr.
94-3216 (American General is a Utah chartered bank insured by the F.D.I.C.; distric

12

These cases require that we resolve the conflict between state consumer-

protection law and federal banking law. We will first consider the district courts'

holdings that removal jurisdiction was proper, based on the doctrine of complete

preemption.  We will reverse the district courts on this issue. The Supreme Court's

conservative extension of the complete preemption doctrine and the application of t

Third Circuit's two-pronged test establish that federal jurisdiction is lacking in

cases in which the plaintiffs did not amend their complaints to allege federal clai

Certain plaintiffs also alleged federal causes of action against Californ

lending institutions.[0]  Consequently, we will next consider claims particular to th

actions, which the district court dismissed.  We conclude that the district court p

determined that the plaintiffs in two of the California-lender actions lacked stand

In the remaining action, however, we must consider whether the term "interest" in §

the National Bank Act, 12 U.S.C. § 85 (1988), encompasses late charges and over-lim

assessed to credit card holders. We will affirm the district court to the extent th

court held that plaintiffs' state law claims regarding late charges and over-limit

were substantively preempted.  See Ament v. PNC Nat'l Bank, 849 F. Supp. 1015, 1018

(W.D. Pa. 1994).  We will reverse and remand, however, for further proceedings rega

the legality of these fees under California law.

I.

docket number 92-375); Szydlik v. Associates Nat'l Bank, No. 94-3216 (Associates Na
is a national bank located in Delaware, but its predecessor in interest was located
California; district court docket number 92-1025); Deffner v. CoreStates Bank, No.
(this consolidated action involves both Corestates, which is a national bank locate
Delaware, and Household Bank, which is a federal savings association located in Cal
and chartered by the federal government under the Home Owners' Loan Act; district c
docket numbers 92-349, 92-398); Bartlam v. Bank of Am., No. 94-3217 (Bank of Americ
national bank located in California; district court docket number 92-1427); Tompkir
Chase Manhattan Bank (USA), No. 94-3218 (Chase is a Delaware chartered bank insured
F.D.I.C.; district court docket number 92-714).
[0]     The three California lender cases are Szydlik v. Associates National Bank
94-3216, Bartlam v. Bank of America, No. 94-3217, and Deffner v. CoreStates Bank, N
3217.

13

Plaintiff cardholders allege that the defendant banks violated Pennsylvan

by charging certain fees in connection with their credit card programs.  Plaintiffs

accounts are governed by agreements that provide for one or more of the following c

percentage-based finance charges on outstanding balances, annual fees, over-credit

charges, late charges, returned check charges, and cash advance fees. Plaintiffs cc

all of the charges, except for the finance charges, violate Pennsylvania statutory[0]

common law.

Plaintiffs filed eleven separate actions in the Courts of Common Pleas fc

Allegheny and Philadelphia counties.  The banks filed notices of removal based on f

question and diversity jurisdiction.  The nine cases filed in Allegheny County were

removed to the United States District Court for the Western District of Pennsylvani

where they were consolidated.  The two Philadelphia County cases were removed to th

United States District Court for the Eastern District of Pennsylvania.

Plaintiffs moved to remand.  The district courts denied the motions, hol

federal question jurisdiction existed based on the "complete preemption" doctrine.

v. Mellon Bank (DE), 825 F. Supp. 1239, 1243 (E.D. Pa. 1993); Ament, 825 F. Supp. a

The district court then transferred the Eastern District cases to the Western Distr

The banks filed motions to dismiss, for judgment on the pleadings and for

summary judgment.  The district court granted the motions and dismissed all of the

actions, holding that § 30 of the National Bank Act, 12 U.S.C. § 85,[0] and § 521 of

Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), 12

§ 1831d (1988 & Supp. III 1991), preempted Pennsylvania's prohibition of the challe

fees. Ament, 849 F. Supp. at 1018-19.  The district court held that the banks' char

---

[0] Plaintiffs invoke the Pennsylvania Goods and Services Installment Sales A
Stat. Ann. tit. 69, §§ 1101-2303 (West 1994); the Pennsylvania Unfair Trade Practic
Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1 to 201-9.2 (West 1993); a
Pennsylvania Banking Code of 1965, Pa. Stat. Ann. tit. 7, §§ 101-2204 (West 1995).
[0] Future references to § 30 of the National Bank Act, codified at 12 U.S.C.
and 86, will be to the codified sections.

constituted "interest" under federal law and that plaintiffs' state law claims were

preempted.  Id. at 1019-21. These consolidated appeals followed.  Assuming the dist

court properly had jurisdiction, we have appellate jurisdiction under 28 U.S.C. § 1

(1988).

## II.

Plaintiffs challenge the propriety of federal court removal jurisdiction

but three of these cases.[0] Defendant's removal petitions were premised on both fede

question jurisdiction, via the complete preemption doctrine, and on diversity of

citizenship.  The district court asserted subject matter jurisdiction based on comp

preemption and therefore failed to reach diversity.  We disagree.  We find no juris

under either the complete preemption doctrine or the diversity statute.

We exercise plenary review in jurisdictional matters. Packard v. Provider

Bank, 994 F.2d 1039, 1044 (3d Cir. 1993), cert denied sub nom. Upp v. Mellon Bank,

___ U.S. ___, 114 S.Ct. 440 (1993).  Removal of civil actions from state to federal

is governed by 28 U.S.C. § 1441 (1988), which provides in pertinent part:

> Except as otherwise expressly provided by Act of Congress, any civil
> action brought in a State court of which the district courts of the
> United States have original jurisdiction, may be removed by the . . .
> defendants[] to the district court of the United States for the
> district and division embracing the place where such action is
> pending.

Removal is therefore premised on original jurisdiction, which in turn must rest on

federal question jurisdiction under 28 U.S.C. § 1331 or on diversity jurisdiction u

U.S.C. §1332.

---

[0] There is no dispute that jurisdiction was proper in Deffner v. Corestates
No. 94-3217, Szydlik v. Associates National Bank, No. 94-3216, and Bartlam v. Bank
America, No. 94-3217, because these cases all contained federal questions on the fa
the plaintiffs' amended complaints.  The discussion in part II of this opinion is
therefore not relevant to these cases.

We first consider federal question jurisdiction under 28 U.S.C. § 1331, t

basis upon which the district court found jurisdiction.  In determining whether a f

question is raised, the "well-pleaded complaint" rule applies.  Railway Labor Execu

Ass'n v. Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936, 939 (3d Cir. 1988).  This r

requires the federal question be presented on the face of the plaintiff's properly

complaint in order for the case to be removable under § 1441. See Gully v. First Na

Bank, 299 U.S. 109, 112-13 (1936).  The presence of a federal defense does not make

removable even if the defense is preemption and even if the federal defense is the

issue in the case.  Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987).  The we

pleaded complaint rule "makes the plaintiff the master of the claim; he or she may

federal jurisdiction by exclusive reliance on state law."  Id. at 392.

The doctrine of complete preemption is a narrow corollary to the well-ple

complaint rule.  The Supreme Court explained the doctrine in Caterpillar Inc., 482

393 (citation omitted):

> On occasion, the Court has concluded that the pre-emptive force of a stat
> so "extraordinary" that it "converts an ordinary state common-law complai
> one stating a federal claim for purposes of the well-pleaded complaint ru
> . .  Once an area of state law has been completely pre-empted, any claim
> purportedly based on that pre-empted state law is considered, from its
> inception, a federal claim, and therefore arises under federal law.

The complete preemption doctrine is of recent vintage. Since 1968, the Su

Court has found complete preemption expressly in only two settings:  (1) for claims

alleging a breach of a collective bargaining agreement that fall under § 301 of the

Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1988), see Avco Corp. v. Aero I

No. 735, 390 U.S. 557 (1968); and (2) for claims for benefits or enforcement of rig

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)

(1988), see Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-67 (1987).[0]  The

---

[0]      The Supreme Court also implicitly found complete preemption in Oneida Inc
Nation v. County of Oneida, 414 U.S. 661, 675 (1974), based on the exclusive applic
of federal law to claims regarding tribal rights to Indian lands.  Id. at 667; see

16

has applied the doctrine "primarily in cases raising claims pre-empted by § 301 of

LMRA." Caterpillar Inc., 482 U.S. at 393. Other courts of appeals have cautiously

extended the boundaries of the complete preemption doctrine in some instances[0] but

to expand the doctrine in others.[0]

This court has adopted a two-pronged test by which a federal court may de

whether it is authorized to assert complete preemption jurisdiction. Pursuant to t

test, a court determines the "very limited area in which a federal court in a case

from a state court is authorized to recharacterize what purports to be a state law

as a claim arising under a federal statute." Railway Labor, 858 F.2d at 942. Firs

court must determine that "the statute relied upon by the defendant as preemptive c

civil enforcement provisions within the scope of which the plaintiff's state claim

Id. at 942 (citing Franchise Tax Board, 463 U.S. at 24, 26). Second, the court must

"a clear indication of a Congressional intention to permit removal despite the plai

---

Caterpillar Inc. v. Williams, 482 U.S. 386, 393 n.8 (1987) (observing the Court's i
use of complete preemption in Oneida).

The reach of complete preemption in these areas of federal law is closely
circumscribed. For example, it is only claims that rely on interpretation of a col
bargaining agreement that are completely preempted by § 301 of the LMRA. Caterpilla
U.S. at 394. Not all claims relating to ERISA are completely preempted for purpose
removal jurisdiction. Franchise Tax Bd. v. Construction Laborers Vacation Trust, 46
1, 25 (1983); see also Dukes v. U.S. Healthcare, Inc., 57 F.3d 350 (3d Cir. 1995)
(observing the limited nature of complete preemption over ERISA claims).

[0]  See, e.g., M. Nahas & Co. v. First Nat'l Bank, 930 F.2d 608, 612 (8th Cir
(holding complete preemption applies to § 85 and § 86 of the National Bank Act, 12
§§ 85 & 86); Rosciszewski v. Arete Assocs., 1 F.3d 225, 232–33 (4th Cir. 1993) (hol
complete preemption applies to § 301 of the Copyright Act, 17 U.S.C. § 301); Trans
Airlines v. Mattox, 897 F.2d 773, 787 (5th Cir.) (holding complete preemption appli
§ 105(a)(1) of the Airline Deregulation Act, 49 U.S.C. § 1305), cert. denied, 498 U
(1990).

[0]  See, e.g., Hurt v. Dow Chem. Co., 963 F.2d 1142, 1144–45 (8th Cir. 1992)
(refusing to extend the complete preemption doctrine to the Federal Insecticide,
Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136-136y); Robinson v. Michigan Consol.
Co., 918 F.2d 579, 585 (6th Cir. 1990) (refusing to extend the complete preemption
doctrine to suits against trustees in bankruptcy); Aaron v. National Union Fire Ins
876 F.2d 1157, 1166 (5th Cir. 1989) (refusing to extend the complete preemption doc
to § 5 of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905), cer
denied, 493 U.S. 1074 (1990).

17

exclusive reliance on state law."  Id.; see also Goepel v. National Postal Mail Han

Union, 36 F.3d 306, 311 (3d Cir. 1994), cert. denied, __ U.S. __, 115 S. Ct. 1691

Krashna v. Oliver Realty, Inc., 895 F.2d 111, 114 (3d Cir. 1990).

The first prong of the test requires a comparison between the federal sta

enforcement provisions and the nature of the plaintiffs' claims.  We must ask if th

National Bank Act's and DIDA's civil enforcement provisions, 12 U.S.C. §§ 86 and 18

govern the same interests plaintiffs seek to vindicate in their suits.  See Allstat

Co. v. 65 Security Plan, 879 F.2d 90, 93-94 (3d Cir. 1989).

Section 86 of the National Bank Act sets forth the civil enforcement prov

for individuals charged excessive interest by national banks:

> The taking, receiving, reserving, or charging a rate of interest
> greater than is allowed by section 85 of this title, when knowingly
> done, shall be deemed a forfeiture of the entire interest which the
> note, bill, or other evidence of debt carries with it, or which has
> been agreed to be paid thereon.  In case the greater rate of interest
> has been paid, the person by whom it has been paid, or his legal
> representatives, may recover back, in an action in the nature of an
> action of debt, twice the amount of the interest thus paid from the
> association taking or receiving the same:  Provided, That such action
> is commenced within two years from the time the usurious transaction
> occurred.

12 U.S.C. § 86.  This section contains the exclusive remedy for borrowers to enfor

terms of § 85 of the National Bank Act[0] and to recover impermissible loan fees coll

by national banks.  M. Nahas, 930 F.2d at 610; see also McCollum v. Hamilton Nat'l

_____

[0]Section 85 provides in part:

> Any association may take, receive, reserve, and charge on any
> loan or discount made, or upon any notes, bills of exchange, or other
> evidences of debt, interest at the rate allowed by the law of the
> State, Territory, or District where the bank is located, or at a rate
> of 1 per centum in excess of the discount rate on ninety-day
> commercial paper . . . and no more, except that where by the laws of
> any State a different rate is limited for banks organized under state
> laws, the rate so limited shall be allowed for associations organized
> or existing in any such State under title 62 of the Revised Statutes.

12 U.S.C. § 85.  This usury provision establishes the allowable rates of interest a

national bank can charge its customers.

18

303 U.S. 245, 248 (1938); <u>Evans v. National Bank of Savannah</u>, 251 U.S. 108, 109, 11[...]

(1919); <u>Farmers' & Mechanics' Nat'l Bank v. Dearing</u>, 91 U.S. 29, 34-35 (1875).

Section 521 of DIDA sets forth the civil enforcement provision for indiv[...] charged excessive interest by federally insured state banks:

> [T]he taking, receiving, reserving, or charging a rate of interest greater than is allowed by subsection (a) of this section,[0] when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.  If such greater rate of interest has been paid, the person who paid it may recover in a civil action commenced in a court of appropriate jurisdiction not later than two years after the date of such payment, an amount equal to twice the amount of the interest paid from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.

12 U.S.C. § 1831d(b) (footnote supplied).  This section is identical to § 86 in al[...] material respects, and Congress wrote it to duplicate the scope of § 86.  <u>Cf.</u> <u>Green[...] Trust Co. v. Massachusetts</u>, 971 F.2d 818, 826 & n.7 (1st Cir. 1992) (noting the ide[...] of language between the first part of § 521 of DIDA

---

[0]    Subsection (a) provides in part:

> In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper . . . or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a).

and § 85 of the National Bank Act), <u>cert. denied</u>, __ U.S. __, 113 S. Ct. 974 (1993)

scope of the two sections is identical, and the interests covered by § 86 are the s

those covered by § 521.

The banks correctly assert that the interests the cardholders seek to vir

are the same as those protected by both federal statutes.  Plaintiffs' causes of ac

under state law rest on complaints that national banks and federally insured state-

chartered banks charged impermissible fees in connection with credit card loans.  F

of impermissible loan fees is precisely the interest that § 86 of the National Bank

and §521 of DIDA govern.[0]  This satisfies the first prong of the test for complete

preemption.

The second prong of the complete preemption analysis, in which we examine

congressional intent, presents a closer question.  Congress has broad authority to

the jurisdiction of the lower federal courts.  <u>See</u> <u>Kline v. Burke Constr. Co.</u>, 260

---

[0]      Our decision on this point does not, as plaintiffs assert, impermissibly
the merits of the case.  Plaintiffs claim a holding that there is an identity of in
between their cause of action and §§ 85 and 86 reads the phrase "credit related cha
into the term "interest" as used in the statute. This, plaintiffs conclude, is a ru
the merits of the banks' preemption defense and impermissible because "the merits n
be considered when deciding a 'complete preemption' jurisdictional issue."  Appella
Consol. Br. at 16.

The district court did not reach the merits prematurely, nor do we.  In t
typical case, jurisdiction is present if the complaint "sets forth a substantial cl
[under federal law]," and the merits are not reached in making that determination.
<u>Levering & Garriques Co. v. Morrin</u>, 289 U.S. 103, 105, 108 (1933).

Here, in the removal context, our jurisdictional inquiry asks first wheth
there is an identity of interests between the federal civil enforcement provision a
claims at issue and second whether Congress intended to permit removal. Although
addressing these two questions touches on the merits, it does not decide the merits
we determine at the jurisdictional stage that there is the requisite identity of in
between the federal and the state causes of action, we will nevertheless be free to
that the fees at issue are not encompassed within the term "interest" in the federa
statutes.  <u>See also</u> <u>Ament</u>, 825 F. Supp. at 1249 (stating that "[t]his court need no
decide whether the fees and charges at issue in this case actually constitute 'inte
for the purposes of these sections; to do so would be to address the merits of the
controversy, which this court need not -- and should not -- do when deciding the
jurisdictional issue").

20

226, 233-34 (1922) (observing that, aside from the Supreme Court, "[e]very other co

created by the general government derives its jurisdiction wholly from the authorit

Congress"). Accordingly, the existence of removal jurisdiction in a particular cas

on whether Congress has granted it.

In concluding that Congress intended to permit removal in cases implicati

85 and 86 of the National Bank Act, the district courts held that Congress manifest

intent to completely preempt the area by creating an exclusive federal remedy for u

claims against national banks. Goehl, 825 F. Supp. at 1243; Ament, 825 F. Supp. at

By so holding, the trial courts misapplied the second prong of the test laid out in

Railway Labor as a matter of law.

The district courts relied on the reasoning of M. Nahas & Co. v. First Na

Bank, 930 F.2d 608, 612 (8th Cir. 1991), a case in which the Court of Appeals for t

Eighth Circuit found § 86 of the National Bank Act to be "an exclusive federal reme

created by Congress over 100 years ago to prevent the application of overly-punitiv

law usury penalties against national banks." The plaintiff in M. Nahas brought sui

state court against a national bank, alleging that the bank charged an interest rat

was usurious under state law. The bank removed the action to federal district cour

the court refused to remand, holding that the claim was properly characterized as f

The circuit court affirmed.

The M. Nahas holding applied on its face to an instance in which a bank c

a percentage interest rate higher than that allowed by state law. Following M. Nah

however, numerous district courts have held that the National Bank Act completely p

state laws that limit or prohibit late fees and other such fees charged by national

banks.[0] Moreover, a district court in the Eighth Circuit extended the M. Nahas hol

---

[0] See, e.g., Watson v. First Union Nat'l Bank, 837 F. Supp. 146 (S.D. Cal.
Tikkanen v. Citibank (S.D.), N.A., 801 F. Supp. 270 (D. Minn. 1992); Nelson v. Citi
(S.D.), N.A., 794 F. Supp. 312 (D. Minn. 1992).

21

§521 of DIDA, where the plaintiffs challenged late fees and over-limit charges purs

state law.  See Hill v. Chemical Bank, 799 F. Supp. 948 (D. Minn. 1992).  The court

that "like § 86 [of the National Bank Act], § 521(b) creates an exclusive federal r

and therefore "completely preempts the field of usury claims against federally-insu

state banks."  Id. at 952.

Although the banks rely on M. Nahas and its progeny to support their argu

favor of federal jurisdiction, none of the cases are binding on this court.  Moreov

they are inconsistent with this court's previous opinions regarding complete preemp

because they do not convincingly establish congressional intent to make causes of a

within the scope of §§ 85 and 86 of the National Bank Act, or § 521 of DIDA, remova

federal court.[0]

Indeed, the Eighth Circuit has rejected expressly the two-pronged complet

preemption analysis that this court set forth in Railway Labor.  See Deford v. Soo

R.R. Co., 867 F.2d 1080, 1086 (8th Cir.) (rejecting this court's reasoning in Railw

Labor and holding that the Railway Labor Act completely preempts state law claims),

---

[0]      Cardholders argue that City National Bank v. Edmisten, 681 F.2d 942 (4th
1982), a case in which the Fourth Circuit addressed complete preemption in the cont
§ 86, further undermines M. Nahas.  The posture and the facts of that case, however
it distinguishable from the present actions.  In City National Bank, "five national
and two state-chartered federally insured banks sought a declaratory judgment from
district court that an annual `membership fee' which they propose[d] to charge hold
bank credit cards would not violate North Carolina's usury laws if added to the int
currently charged on credit card accounts."  Id. at 943.  Unlike the present case,
question at issue was which North Carolina provision applied to the plaintiffs' cre
card program if the program included annual users' fees.  Stating that "[t]he only
connection between [the] case and § 85 [was] the fact that § 85 incorporates state
the regulation of the interest chargeable by a national bank," the court concluded:

> Plaintiffs could defend an action under state usury law on the ground tha
> provides the exclusive remedy for usury against a national bank, but the
> availability of this defense does not convert the threatened action from
> to a federal one for purposes of determining federal jurisdiction.

Id. at 945-46 (citations omitted).

denied, 492 U.S. 927 (1989); see also, Goepel, 36 F.3d at 315 n.12 (acknowledging t

split between the two courts of appeals).  The Eighth Circuit called the Third Circ

approach "unnecessarily narrow," stating:

> Not only must we look to affirmative congressional intent and civil enfor
> provisions, but we must also look to such factors as the history and purp
> the statute.  Recent case law illustrating the federal nature of the stat
> analogous statutes with complete preemptive powers are also informative.

Id.  Although an examination of Congress's basic goals in enacting §§ 85 and 86 and

history behind them would be consistent with the Eighth Circuit's approach, such an

approach would diverge from that which this court has prescribed.[0] Moreover, it is

with the Supreme Court's narrow application of the complete preemption doctrine.

The Supreme Court has held affirmative evidence of congressional intent t

"the touchstone of the federal district court's removal jurisdiction."  Metropolita

481 U.S. at 66.  And, as discussed above, the Court has found such intent only rare

The complete preemption doctrine was originally rooted in a cause of action arising

§ 301 of the LMRA.  See Avco Corp., 390 U.S. at 557.  The Court extended the doctri

reluctantly, in Metropolitan Life, to an action arising under ERISA.  The Court wro

it did so only because "ERISA's civil enforcement provisions closely parallels [sic

of § 301 of the LMRA," and because explicit language in the ERISA Conference Report

analogized the ERISA provision to the LMRA language.  Metropolitan Life, 481 U.S. a

Railway Labor, 858 F.2d at 940.  "In the absence of explicit direction from Congres

Court wrote,

> [e]ven with a provision such as § 502(a)(1)(B) [the jurisdictional provis
> that lies at the heart of a statute with the unique pre-emptive force of
> . . we would be reluctant to find that extraordinary pre-emptive power, s
> has been found with respect to 301 of the LMRA, that converts an ordinary

---

[0]    See Allstate Ins. Co., 879 F.2d at 93 (holding that complete preemption r
"affirmative evidence of a congressional intent to permit removal despite the plain
exclusive reliance on state law"); see also Goepel, 36 F.3d at 311 (formulating the
requirement as one of clear congressional intent); Krashna, 895 F.2d at 114 (same);
Railway Labor, 858 F.2d at 942 (same).

23

> common law complaint into one stating a federal claim for purposes of the
> pleaded complaint rule.

Metropolitan Life, 481 U.S. at 64–65.[0]

Neither the National Bank Act nor DIDA contains a jurisdictional provisio

evidencing congressional intent to permit removal of the sort relied upon in Avco a

Metropolitan Life. Nor have the banks pointed to congressional language suggesting

parties may bring suit against banks in federal court without regard to the citizen

the parties or the amount in controversy.

Congressional intent to permit removal based on complete preemption woul

difficult to divine from the legislative history of the National Bank Act, because

was passed in 1864, pre-dating federal question jurisdiction, the well-pleaded comp

rule, and the doctrine of complete preemption.[0] The banks argue, nonetheless, that

Congress evidenced an intent to provide an exclusive source of relief for claims of

overcharge that, coupled with the general federal provision allowing for removal of

federal-question cases, demonstrates congressional intent to allow removal. Howeve

defendants point to nothing in the legislative history of §§ 85 and 86 that present

sort of clear indication of congressional intent we have looked for in the past.[0]

---

[0] The Court's refusal to extend the complete preemption doctrine in subsequ
cases further indicates its conservative approach in applying the complete preempti
doctrine. See Franchise Tax Bd., 463 U.S. at 1 (reading § 502(a) of ERISA narrowly
forbid removal of a suit by the state to enforce tax levies against an employee per
plan); Caterpillar, Inc., 482 U.S. at 386 (finding a reference in an affirmative de
to the terms of a collective bargaining agreement insufficient to convert plaintiff
state law breach of contract claims into a claim under § 301 of the LMRA).
[0] Congress granted general original jurisdiction over federal question case
provided for general removal power in 1875. Judiciary Act of 1875, §§ 1, 2, 18 Sta
[0] See Allstate Ins. Co., 879 F.2d at 94 (finding no removal jurisdiction ba
complete preemption where first prong was not met and where the court found no "evi
of an intent on the part of Congress to permit removal of the type of state-law cla
made by [the plaintiff] . . . in cases where the plaintiff exclusively relies on st
law"); Railway Labor, 858 F.2d at 943 (declining to find removal jurisdiction based
complete preemption where there was no federal cause of action within the scope of
the plaintiff's state claim fell and where the court did "not find the requisite
Congressional intent").

24

Similarly, when Congress enacted § 521 of DIDA in 1980, it did not adopt

language or indicate in the legislative history that the provision would support co

preemption.  Cf. Donald v. Golden 1 Credit Union, 839 F. Supp. 1394, 1402 (E.D. Cal

(refusing to find complete preemption pursuant to § 523(b) of DIDA -- which contain

parallel language to § 521 but governs insured credit unions -- because nothing in

provision's legislative history "mentions 'arising under' jurisdiction or compares

effect of § 523(b) to § 301 of the LMRA or § 502(f) of ERISA").

There appears to be no indication that Congress intended to completely pr

the regulation of national banks or federally-insured state lending institutions.[0]

Therefore, we will reverse the judgments of the district courts that found complete

preemption.  Jurisdiction cannot rest on 28 U.S.C. §1331.

The district court did not consider diversity jurisdiction.  Because we c

find jurisdiction based on complete preemption, we must do so.  Although this issue

---

[0]     Accord Copeland v. MBNA America, N.A., 820 F. Supp. 537, 540-41 (D. Colo.
(refusing to apply the complete preemption doctrine pursuant to §§ 85 and 86 of the
National Bank Act, in a case challenging late fees imposed pursuant to a credit car
agreement, upon concluding "that a proposition that is not obvious from the plain m
of a statute's language, nor from its legislative history, simply cannot be regarde
clear manifestation of congressional intent"); Donald, 839 F. Supp. at 1403 (findin
complete preemption in § 523 of DIDA).  But see M. Nahas, 930 F.2d at 612; Watson,
Supp. at 149.

We also observe that to the extent the dissent finds in Congressional
pronouncements, the statutory scheme, and the historical context a need for "unifor
federal construction of the Act," Dissenting Opinion at 1, this goal is ably achiev
our federal system without the extreme step of complete preemption.  We are confide
the United States Supreme Court will continue to uphold its historic role in resolv
conflicts that may arise among the state supreme courts.  28 U.S.C. § 1257 ("Final
judgments or decrees rendered by the highest court of a state . . . may be reviewed
Supreme Court by writ of certiorari where the validity of a treaty or statute of th
United States is drawn in question . . . ."); see Martin v. Hunter's Lessee, 14 U.S
Wheat) 304, 347-48 (1816) (finding rationale for appellate review of state tribunal
United States Supreme Court in "the importance, and even necessity of uniformity of
decisions throughout the whole United States, upon all subjects within the purview
constitution").  Moreover, should the "vagaries of different states' interpretation
yield truly disastrous results, Congress retains the power to revisit the issue.  T
dissent's concerns, however valid, are simply not the stuff of which complete preem
is made.

25

not raised in the parties' briefs, defendants have presented the issue in a supplem

motion.  Moreover, as a court of limited jurisdiction we have a duty to raise poten

jurisdictional issues sua sponte.  Employers Ins. of Wausau v. Crown Cork & Seal Co

F.2d 42, 45 (3d Cir. 1990); Trent Realty Assoc. v. First Fed. Sav. & Loan Ass'n of

Philadelphia, 657 F.2d 29, 36 (3d Cir. 1981).  We find that the requirements for

jurisdiction based on diversity of citizenship are not met.

We observe initially that the cases consolidated before us each purport t

advance the interests of a class, but not one has been certified as a class action.

position is therefore analogous to our previous decision in Packard, 994 F.2d at 10

(noting that no class was ever certified).  Despite the absence of certification, c

action principles still apply: To support diversity jurisdiction, there must be com

diversity between the named representatives of the class and the defendants, In re

Asbestos Litig., 921 F.2d 1310, 1317 (3d Cir. 1990), cert. denied sub nom. U.S. Gyp

v. Barnwell Sch. Dist. No. 45, 499 U.S. 976 (1991), and each member of the class mu

the statutorily required minimum amount in controversy, In re Corestates Trust Fee

39 F.3d 61, 64 (3d Cir. 1994).  We also observe that because the issue of diversity

jurisdiction arises on removal, the defendant bears the burden of proving the statu

requirements.  Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921); Columbi

Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir. 1995). All doubts on remov

resolved in favor of remand.  Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d C

1990), cert. denied, 498 U.S. 1085 (1991); Abels v. State Farm Fire & Cas. Co., 770

26, 29 (3d Cir. 1985).

Diversity jurisdiction founders on the amount in controversy requirement.

U.S.C. § 1332(b).[0]  As the party asserting jurisdiction, defendants must demonstrat

---

[0]     Because of our holding on this requirement, we need not consider § 1332's
complete diversity requirement.  See Owen Equipment & Erection Co. v. Kroger, 437 U
(1978); Field v. Volkswagenwerk AG, 626 F.2d 293 (3d Cir. 1980).

each member of the plaintiff class alleges an amount in controversy greater than $5
Id.  In assessing the amount claimed where the defendant seeks removal, we place gr
confidence in the allegations of the plaintiff's complaint, because we presume that
plaintiff has not claimed an excessive amount in order to obtain federal jurisdicti
St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938); Albright v. R
Reynolds Tobacco Co., 531 F.2d 132, 134 (3d Cir.) (recognizing different standard f
evaluating jurisdictional amount on removal compared to original jurisdiction), cer
denied, 426 U.S. 907 (1976). Moreover, a plaintiff who has a claim for more than th
jurisdictional amount may choose to sue for a lesser amount to avoid the monetary
threshold for removal.  St. Paul, 303 U.S. at 292; Burns v. Windsor Ins. Co., 31 F.
1092, 1095 (11th Cir. 1994); Gafford v. General Elec. Co., 997 F.2d 150, 157 (6th C
1993).  Accordingly, the defendant who seeks removal and challenges either explicit
implicitly the jurisdictional amount alleged by the plaintiff faces a heavy burden.
Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1012 n.6 (3d Cir.
(discussing challenge to joinder of non-diverse defendant to defeat diversity), cer
dismissed sub nom. American Standard, Inc. v. Steel Valley Auth., 484 U.S. 1021 (19

In the case before us, defendants have failed to carry this burden.  It c
be alleged seriously that the amounts sought by any individual plaintiff exceed $50
even accounting for the possibility of treble damages under certain Pennsylvania co
protection statutes.  Pa. Stat. Ann. tit. 69, § 2204 (West 1994); Pa. Stat. Ann. ti
§ 201-9.2 (West 1993).  The individual plaintiffs sue for a variety of charges rang
from a $2 fee per cash advance to a $60 annual fee, with the vast majority of the c
hovering in the $10-$18 range.[0] It is well-settled that members of a class cannot

[0]    Ament paid an annual fee of $18 and late fee of $10, App. at 11a; Caplan
annual fee of $18 and a late payment charge of $15, App. at 2; Szydik a late paymen
of $15, App. at 309a; Thompson an annual fee of $18, App. at 369a; Tompkins a late
fee of $10 and a cash advance fee of $2 in his action against American General Fina
Center, App. at 596a-97a, and an annual fee of $20 and a late fee of $10 in his act
against Chase Manhattan Bank, App. at 644a-45a; Spellman at least one late charge o

aggregate their claims to exceed the jurisdictional threshold.  <u>Snyder v. Harris</u>,

332, 338 (1969).  Each class member must claim the requisite amount in controversy.

<u>v. International Paper Co.</u>, 414 U.S. 291, 301 (1973).  None of the individual claim

support diversity jurisdction.[0]

Absent aggregation, three possible routes to the $50,000 minimum lie open

Plaintiffs seek injunctive relief prohibiting the defendants from receiving, chargi

contracting for the challenged fees.  If the value of the injunction sought is view

the defendants' perspective, it could produce a loss in revenue exceeding the statu

threshold.  Defendants also allege diversity jurisdiction based on the "total detri

they would suffer if injunctive relief were granted.  In addition, defendants cite

potential recovery that could include substantial attorneys' fees.  We review each

argument in turn.

We first reject the suggestion that the request for injunctive relief con

these individual actions for fees into a collective action for the total value of t

to the defendant.  In <u>In re Corestates Trust Fee Litig.</u>, we observed that,

> In injunctive actions, it is settled that the amount in controversy is
> measured by the value of the right sought to be protected by the
> equitable relief.  See <u>Smith v. Adams</u>, 130 U.S. 167, 175, 9 S.Ct. 566,
> 569, 32 L.Ed. 895 (1889); <u>Spock v. David</u>, 469 F.2d 1047, 1052 (3d
> Cir. 1972) ("In cases where there is no adequate remedy at law, the
> measure of jurisdiction is the value of the right sought to be
> protected by injunctive relief."), <u>rev'd on other grounds</u> <u>Greer v.</u>
> <u>Spock</u>, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).  In other
> words, "it is the value to plaintiff to conduct his business or
> personal affairs free from the activity sought to be enjoined that is
> the yardstick for measuring the amount in controversy."  14A C.

---

$20.25, <u>App.</u> at 1163a-64a, 1180a; and Goehl various "payments" which included late
$15, <u>App.</u> at 1268a.  This list does not include the three cases where jurisdiction
properly lodged based on a federal question.

[0] As in <u>Packard</u>, because no plaintiff has placed more than $50,000 at issue
need not address whether 28 U.S.C. §1367's codification of supplemental jurisdictio
overruled <u>Zahn</u> where the named plaintiff claims the jurisdictional amount. 994 F.2
1045 n.9.  <u>Cf.</u> <u>In re Abbot Laboratories</u>, 51 F.3d 524 (5th Cir. 1995) (assigning att
fees to class representative to meet jurisdictional amount, then asserting suppleme
jurisdiction over the class).

> Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u>, § 3708
> at 143-44 (2d ed. 1985) (citations omitted).

39 F.3d 61, 65 (3d Cir. 1994).  Following this rule, we assessed the requested reli

based on its value to the individual plaintiff, and we expressly rejected the conte

that injunctive relief somehow broadened the amount at issue beyond the plaintiff's

<u>Id.</u> at 66.  In reaching this holding, we built on our decision in <u>Packard</u>, where or

similar to <u>Corestates</u>, we held that a challenge to a small "sweep fee" levied by ba

part of their management of trust accounts placed in controversy <u>only</u> the value of

to each individual plaintiff, <u>not</u> the aggregate cost of the injunction to the bank.

<u>Packard</u>, 994 F.2d at 1050.  We abide by these rulings in the present situation as w

Taken alone, plaintiffs' prayers for injunctive relief will neither convert their

individual claims into a collective recovery, nor force us through the looking glas

evaluate their claims from the defendant's perspective.

This same authority requires us to reject defendant's second contention,

"total detriment" theory.  <u>See</u> <u>Packard</u>, 994 F.2d at 1050 ("allowing the amount in

controversy to be measured by the defendant's cost would eviscerate <u>Snyder</u>'s holdin

the claims of class members may not be aggregated in order to meet the jurisdiction

threshold"); <u>Brechbill v. Diner's Club</u>, 80 F.R.D. 486 (W.D. Pa. 1978) (rejecting "t

detriment" concept); <u>see</u> <u>also</u> <u>Snow v. Ford Motor Co.</u>, 561 F.2d 787, 790 (9th Cir. 1

Allowing a defendant to inject the "total detriment" theory would give the defendan

control over forum selection whenever a claim could be generalized beyond the indiv

plaintiff.  Our precedents dispose of this argument.

Finally, we turn to the issue of attorneys' fees.  It is well-settled tha

reasonable attorneys' fees are a part of the statutory action and have been request

plaintiffs, their value will be assessed as part of the amount in controversy.  <u>Mis</u>

<u>State Life Ins. Co. v. Jones</u>, 290 U.S. 199 (1933).  Here, to satisfy the $50,000 mi

attorneys' fees would have to make up the vast majority of the required quantum. Ju

29

we scrutinize a claim carefully where a request for punitive damages comprises the

majority of the jurisdictional amount, Packard, 994 F.2d at 1046, we will look equa

critically at any case where attorneys' fees constitute the principal basis for

jurisdiction. We also note that conceptually, consistent with Snyder and Zahn, att

fees must be distributed across the class or across the claimants. See Goldberg v.

Int'l, Inc., 678 F.2d 1365, 1367 (9th Cir.), cert. denied, 459 U.S. 945 (1982); but

re Abbott Laboratories, 51 F.3d 524, 526-27 (5th Cir. 1995) (allocating attorneys'

class representative under Louisiana class action fee recovery statute). Hence, to

support jurisdiction, the attorneys' fees of each individual plaintiff combined wit

other elements of the prayer for relief must exceed the statutory minimum.

In a typical commercial case such as this one, we cannot believe that whe

individual plaintiff asserts claims in the range of tens to hundreds of dollars, an

attorney's fee exceeding $49,000 would be either reasonable or justified. See, e.g.

v. General Motors Corp., ___ F.R.D. ___, 1995 WL 653961 (E.D. Pa. Nov. 7, 1995) (Da

J.) (reaching similar conclusions after excellent discussion of removal issue). A

difference of this order of magnitude is conclusive. Moreover, aside from their ba

assertion that attorneys' fees would be sufficient to satisfy the statutory minimum

defendants have offered no proof on this issue. Because the burden of demonstratin

jurisdiction lies squarely on the removing defendants, we have little trouble holdi

the potential for attorneys' fees will not satisfy the jurisdictional amount.

We conclude that it appears "to a legal certainty" that the claims in que

were "for less than the jurisdictional amount." St. Paul, 303 U.S. at 289. In rea

this conclusion, we continue our tradition of reading the diversity statute narrowl

not to frustrate Congress' purpose in keeping the diversity caseload of the federal

under some modicum of control. Packard, 994 F.2d at 1044-45; Nelson v. Keefer, 451

289, 293-94 (3d Cir. 1971). We therefore find no jurisdiction under 28 U.S.C. § 13

See Smiley v. Citibank (S.D.), N.A., 863 F. Supp. 1156, 1162-65 (C.D. Cal. 1993) (r

30

diversity-based removal because class members claims could not be aggregated, incre

through punitive damages, or viewed collectively under an injunction to meet

jurisdictional amount); Hunter v. Greenwood Trust Co., 856 F. Supp. 207, 220 (D.N.J

(refusing diversity-based removal in challenge to late fees on credit cards "becaus

jurisdictional amount in controversy is not satisfied"); Copeland v. MNBA America,

820 F. Supp. 537, 541-42 (D. Colo. 1993) (same).

We hold that both federal question jurisdiction and diversity jurisdictic

lacking. Removal was therefore improper. Consequently, we will reverse the assert

jurisdiction and instruct the district judges to remand the non-California lender c

the state courts.

### III.

Although our discussion to this point disposes of most of the cases befor

the three California lender cases remain. In these disputes the plaintiffs amended

complaints to allege specific violations of federal law, obviating the jurisdictior

issue. The plaintiffs in these cases raise different challenges that we now addres

### A.

The plaintiffs in Bartlam v. Bank of America, No. 94-3217, and Deffner v.

Corestates Bank, No. 94-3217, ask us to consider whether the district court properl

determined that they lack standing. Because we will affirm, we do not reach the ot

issues that these plaintiffs raise.

Plaintiff Bartlam brought suit against Bank of America pursuant to the Na

Bank Act and two Pennsylvania consumer protection statutes. She challenged a late

charge, a return check charge, and an over-credit limit charge based on her credit

agreement with Bank of America. Bartlam concedes that she has no standing to chall

the credit limit charge (as no such charge was part of her credit agreement) and th

did not actually incur a return check charge or late fee during the relevant perioc

Nevertheless, she argues that the district court erred in deciding that she lacked

31

standing.  The National Bank Act, she asserts, creates a cause of action for usurio[us]

charges even if the borrower has not actually paid them but has merely contracted f[or]

them.  She also argues that the district court's holding on standing is inconsisten[t]

its holding on complete preemption.

The requirements for standing are clear.  The plaintiff must have suffere[d]

injury in fact, the injury must be "fairly . . . traceable to the challenged action

defendant," and it must be likely the injury would be redressed by a favorable deci[sion].

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Warth v. Seldin, 422 U[.S.]

490, 501 (1975).  Bartlam did not pay the contested charges within the statute of

limitations period in § 86 and therefore cannot meet the injury in fact requirement

also Haas v. Pittsburgh Nat'l Bank, 526 F.2d 1083 (3d Cir. 1975) (holding plaintiff

standing to challenge a service charge when she had not incurred the relevant charg[es]).

Despite this problem, Bartlam alleges that she has standing because Bank

America contracted with her for the contested fees.  She contends the term "reserve[" in §]

85 means "to contract,"[0] and that the formation of a contract with usurious interes[t is]

enough to violate the terms of the statute and provide standing for a cause of acti[on]

under § 86.  We do not agree.  The Supreme Court has explained that the term "reser[ve]

refers to the practice of discounting, where a bank reduces the principal of a loan

deducting interest in advance:

> To discount, ex vi termini, implies reservation of interest in advance
> . . . . [W]e think Congress intended to endow national banks with the
> power, which banks generally exercise, of discounting notes reserving
> charges at the highest rate permitted for interest.  To carry out this
> purpose, the National Bank Act provides that associations organized
> under it may reserve on any discount interest at the rate allowed by
> the State; and only when there is reservation at a rate greater than
> the one specified does the transaction become usurious.

---

[0]     See supra note 13 for the text of § 85.

Evans, 251 U.S. at 114. This passage makes clear that "reserving" does not mean "contracting."

More importantly, regardless of how one defines "reserve," § 86 does not a cause of action unless the borrower has actually paid the interest sought to be recovered. McCarthy v. First Nat'l Bank, 223 U.S. 493, 498-99 (1912). Section 86 contemplates two types of cases, those where the lender sues for usurious charges t borrower has not paid, and those where the borrower seeks to recover usurious inter has paid. Id. Section 86 provides a cause of action for the latter instance, but former. For unapid charges, § 86 provides the borrower with a defense to a suit br by the bank, but it does not allow the borrower to sue directly. Id. Thus, the Nat Bank Act does not provide a cause of action for charges for which the borrower has contracted but not paid. Bartlam's claim is not legally cognizable.

Finally, Bartlam argues that the district court's holding that complete preemption allowed removal is inconsistent with its holding that she lacks standing Subject matter jurisdiction in this case was based on the allegation in plaintiff's amended complaint that Bank of America had violated 12 U.S.C. § 85.[0] The district had jurisdiction over the case based on this federal question, and it was not incor

---

[0]     Bartlam cannot contest the existence of federal subject matter jurisdicti because she amended her complaint to include a federal cause of action. See Bernst Lind-Waldock & Co., 738 F.2d 179, 185-86 (7th Cir. 1984). In Bernstein, the court explained:

> The amended complaint was thus within the original jurisdiction of the
> federal district courts and it makes no difference that it was filed
> only because [the plaintiff's] previous suit had improperly been
> removed. If he was convinced that the original action was not
> removable he could have stuck by his guns and we would have vindicated
> his position on appeal. But once he decided to take advantage of his
> involuntary presence in federal court to add a federal claim to his
> complaint he was bound to remain there.

Id. at 185.

33

for the district court to declare that the plaintiff lacked standing.  Moreover, co

preemption jurisdiction did not exist in any event.[0]

The district court's holding that Barlam lacked standing was therefore co
We will affirm the district court's dismissal of Bartlam's federal claims but reman
matter to the district court so that it may in turn remand the case to state court.

## B.

We next consider similar standing arguments made in Deffner.  Appellant D
filed a class action against Household, a federal savings association located in
California, and against Corestates Bank of Delaware, N.A., a national bank located
Delaware, alleging that various credit card charges imposed pursuant to their credi
agreements violated Pennsylvania state law.  Deffner subsequently amended the compl
include two new federal claims against Household, alleging that Household's over-cr
limit charges, late payment charges, and returned check charges are unlawful under

---

[0] The district court dismissed all of Bartlam's claims, including her praye
declaratory and injunctive relief. Bartlam asserts that an adverse determination re
her standing to bring a damages claim does not bar her claims for declaratory or
injunctive relief.  Bartlam did not raise this argument in her initial brief before
and we consider it waived.  See Simmons v. City of Philadelphia, 947 F.2d 1042, 106
Cir. 1991) (stating that "absent extraordinary circumstances, briefs must contain
statements of all issues presented for appeal, together with supporting arguments a
citations"), cert. denied, 503 U.S. 985 (1992).

We do note, however, that even if the issue were not waived, the result w
not change.  The Declaratory Judgment Act provides district courts with discretion
whether to decide a motion for declaratory judgment. Exxon Corp. v. F.T.C., 588 F.
900 (3d Cir. 1978).  We review the exercise of that discretion with some deference.
Declaratory judgments can only issue when there is an actual controversy between th
parties. Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d C
1990).  The boundaries of the "actual controversy" requirement are difficult to det
Id.  We need not determine whether an "actual controversy" exists here, as we are
satisfied the district court properly exercised its discretion.  Even if we were to
that the district court was wrong, we "will not reverse merely because we would dec
differently." Exxon, 588 F.2d at 900.  The reasoning is the same for injunctive re
with the same result.  We find no error here.  See also Landau v. Chase Manhattan E
N.A., 367 F. Supp. 992, 996-97 (S.D.N.Y. 1973) (holding, in almost identical factua
context, that plaintiff had shown neither injury in fact for a damages claim, nor
sufficient likelihood of future injury to sue for injunctive or declaratory relief)

U.S.C. § 1463(g)(2) (Supp. IV 1992), a provision of the Home Owners' Loan Act, the

statute governing lending charges by federal savings associations.

Ultimately, Household moved for judgment against the Amended Complaint on

grounds that: (1) having never incurred any of the challenged charges, Deffner lac

standing to bring her claims; and (2) Deffner's state law claims were preempted by

law. The trial court granted Household's motion for judgment. Deffner argues on a

that she has standing.

We hold Deffner lacked standing to bring the claims at issue. Deffner di

incur the charges she challenges, and our discussion of standing with respect to Ba

supra part III.A, applies equally to this case.[0] Deffner may not sue Household for

charges that she neither paid nor incurred.

Furthermore, like Bartlam, Deffner lacks a statutory basis for her cause

action. Section 1463(g) of the Home Owners' Loan Act contains similar language to

U.S.C. §§ 85 and 86.[0] Section 1463(g) is not identical to §§ 85 and 86, but the on

---

[0] We also apply the holding regarding Bartlam's claim for injunctive and declaratory relief to Deffner's claims. See supra note 25.

[0] The section provides:

(g) Preemption of State usury laws

(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.

(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of

35

material difference between the sections weakens Deffner's argument.[0]  As discussed

part III.A, Bartlam attempted to find a cause of action for unpaid fees in the "res

language of § 86.  This language is not part of 12 U.S.C. §1463(g)(2), which provic

exclusive remedy for violations of the usury provision of the Home Owner's Loan Act

remedy provision of § 1463(g)(2) prohibits only "receiving" or "charging" a usuriou

of interest, which Household has not done.  Thus Deffner cannot even make Bartlam's

argument, which we rejected, that the statute is intended to cover contractual

arrangements.  Like Bartlam, Deffer has no cause of action and no standing.

We need not determine whether Deffner's state claims are substantively pr

by § 1463(g).[0]  Since Deffner lacks standing to bring her federal claims, we remand

case to the district court with instructions to remand the state law issues to stat

court.

C.

Finally, the plaintiff in <u>Szydlik v. Associates Nat'l Bank</u>, No. 94-3216,

that the district court erred in dismissing his case.  Szydlik challenges returned

charges, late fees, and over-limit fees.  He alleges that the district court improp

dismissed his case <u>sua sponte</u> and erred in determining that California law allowed

charges that Associates National Bank imposed.  We will first address a preliminary

procedural point, then assess standing issues, and finally reach the merits of cert

Szydlik's claims.

---

> such payment, an amount equal to twice the amount of the interest paid
> from the savings association taking or receiving such interest.

12 U.S.C. § 1463(g) (emphasis added).
[0]    The statutory structure of 12 U.S.C. § 1463(g)(2) creates a defense in th
clause and a cause of action in the second, in a manner analogous to § 86.
[0]    We note, however, that because § 1463(g)'s language is clearly based on §
the definition of interest in § 1463(g) has the same scope as § 85.  Moreover, the
legislative history strongly indicates that Congress intended a particularly broad
of interest for § 1463, as Congress specifically noted interest should include all
related charges."  H.R. Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 343 (1989),
<u>reprinted in</u> 1989 U.S.C.C.A.N. 86, 139.

Szydlik presents a preliminary procedural argument, in which he contends [that] because Associates National Bank never filed a dispositive motion, the district cou[rt] erred in dismissing his claims. The district court dismissed Szydlik's claims on A[pril] 12, 1994. Tompkins v. American General Financial Center, No. 92-375, slip op. at 1 [(W.D.] Pa. Apr. 12, 1994) ("April 12, 1994, Order"). In its April 12, 1994, Order, the di[strict] court referred to its Order of June 21, 1993, in which it had stated that "[any] defendants who have not yet filed a motion to dismiss are assumed to agree with the [other] motions to dismiss and corresponding briefs already filed, unless the court is noti[fied] otherwise by July 2, 1993." Ament v. PNC Nat'l Bank, No. 92-244, slip op. at 3 (W.[D. Pa.] June 21, 1993) ("June 21, 1993, Order"). Szydlik argues the June 21, 1993, Order a[pplies] only to dispositive motions filed before that Order. Szydlik asserts that because [no] defendant filed a dispositive motion addressing the issues of California law releva[nt to] Szydlik's claims prior to June 21, 1993, the district court's dismissal of his clai[ms was] sua sponte and improper.

The essence of this argument is that because Associates National Bank did [not] file a specific dispositive motion it was barred from benefitting from motions file[d by] other defendants. Szydlik's argument reads the district court's June 21, 1993, Orde[r,] which was based on Federal Rule of Civil Procedure 42(a), too narrowly. The distri[ct] court sought to avoid repetitive briefing for issues common to the consolidated cas[es and] gave clear notice of its intention to apply the defendants' dispositive motions to [all of] the cases, including Szydlik's. Hence, there is no merit to his preliminary point.

Next, we must consider standing. Szydlik does not allege that he ever in[curred] a return check charge, and therefore we hold that he lacks standing on that claim, [based] on the reasoning of our discussion of Bartlam v. Bank of America, No. 94-3217. See [supra] part III.A. Szydlik did incur both late fees and over-limit fees of fifteen dollar[s,] and we must therefore consider the merits of these claims. He contends that Califo[rnia]

37

law does not permit any other lender to assess these charges and that Associates Na

Bank's imposition of them is therefore usurious.

The district court disposed of Szydlik's late fee and over-limit fee clai

preliminary motion. Although we are hampered somewhat because the basis for the di

court's dismissal of Szydlik's claims is unclear, Tompkins v. American General Fina

Center, No. 92-375 (W.D. Pa. Apr. 12, 1994) (order of dismissal), we review the dis

court's grant of dismissal motions under a plenary standard. Moore v. Tartler, 986

682, 685 (3d Cir. 1993).

We must first determine whether Szydlik's state law claims are substantiv

preempted by the National Bank Act.[0] Szydlik argues that the word "interest" as u

§ 85 of the National Bank Act does not encompass the contested charges and that fed

law therefore does not preempt state law in the present dispute. We disagree.

We note initially that ordinary preemption differs from complete preempti

Railway Labor, 858 F.2d at 942 (citing Caterpillar, Inc., 482 U.S. at 398). The fo

a question of what substantive law -- federal or state -- should control a claim br

pursuant to state law. Krashna, 895 F.2d at 114 n.3; Hunter v. Greenwood Trust Co.

F. Supp. 207, 212 n.2 (D.N.J. 1992). As this court has held, "[s]tate courts are

competent to determine whether state law has been preempted by federal law and they

be permitted to perform that function in cases brought before them, absent a Congre

intent to the contrary." Railway Labor, 858 F.2d at 942.

---

[0] Szydlik alleged in his amended complaint that the defendant bank (or bank
violated the Pennsylvania Goods and Services Installment Sales Act, Pa. Stat. Ann.
69, §§ 1101-2303 (West 1994), "by contracting for, reserving, charging and receivin
payment charges pursuant to the credit card agreements" at issue, "by contracting f
reserving, charging and receiving return check charges pursuant to the credit card
agreements," and "by contracting for, reserving, charging and receiving over credit
charges pursuant to the credit card agreements." Moreover, he alleges that Associa
National Bank made false and misleading misrepresentations in credit card agreement
violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, F
Stat. Ann. tit. 73, §§201-1 to 201-9.2 (West 1993).

38

The question of when federal law preempts state law under the Supremacy C

U.S. Const. art. VI, cl. 2, is one of congressional intent.  <u>English v. General Ele</u>

496 U.S. 72, 78-79 (1990).  Preemption occurs in three circumstances:  when Congres

explicit statutory language to express its intent; when state law attempts to regul

conduct in an area Congress intended the federal government to occupy exclusively;

when state law actually conflicts with federal law.  <u>Id.</u> at 79.  The Court has note

however, that

> [b]y referring to these three categories, we should not be taken to
> mean that they are rigidly distinct.  Indeed, field pre-emption may be
> understood as a species of conflict pre-emption:  a state law that
> falls within a pre-empted field conflicts with Congress' intent
> (either express or plainly implied) to exclude state regulation.
> Nevertheless, because we previously have adverted to the three-
> category framework, we invoke and apply it here.

<u>Id.</u> at 79 n.5.  The Supreme Court recently clarified the preemption inquiry further

noting that implied preemption can co-exist with an express preemption clause.

<u>Freightliner Corp. v. Myrick</u>, __ U.S. __, 115 S. Ct. 1483, 1487 (1995).  Our task o

determining which category of preemption applies is made simple: lacking express la

of preemption in § 85, we are left with field and conflict preemption, which the Su

Court has made clear we need not worry about distinguishing.[0]

Congress did not specifically define the term "interest" in these statute

While we always start the task of interpretation with the plain meaning of a statut

meaning here is ambiguous.  Although Szydlik argues that "interest" can only apply

---

[0]     It has been argued that the determination of field preemption is tautolog

Little aid can be derived from the vague and illusory but often
repeated formula that Congress "by occupying the field" has excluded
from it all state legislation. Every Act of Congress occupies some
field, but we must know the boundaries of that field before we can say
that it has precluded a state from the exercise of any power reserved
to it by the Constitution.

<u>Hines v. Davidowitz</u>, 312 U.S. 52, 78-79 (1941) (Stone, J., dissenting).

charges in the form of periodic percentage rates, we do not believe the term is eit

limited in meaning or so self-defining. The Court of Appeals for the First Circuit

held that "interest" in § 521 of DIDA does not have a plain meaning limited to "num

interest rates." Greenwood Trust, 971 F.2d at 824-25. The First Circuit's persuas

analysis is relevant to our inquiry because of the similarity between § 521 of DIDA

§ 85 of the National Bank Act. Additionally, Webster's Dictionary defines "interes

"the price paid for borrowing money generally expressed as a percentage of the amou

borrowed paid in one year." Webster's Third New International Dictionary 1178 (196

(emphasis added).

Szydlik contends that a plain meaning can be found in the common law defi

of "interest." We do not agree. We agree with the court in Tikkanen v. Citibank

N.A., 801 F. Supp. 270, 278 (D. Minn. 1992), which responded to a similar argument:

> [Plaintiffs] rely on cases from a handful of jurisdictions to support
> the proposition that late fees cannot be considered interest under
> 'the common law,' as if there were a uniform law of usury applicable
> in all fifty states. . . . Usury statutes and the case law construing
> them vary from state to state; that variation is in fact the genesis
> of these actions.

Szydlik and the other plaintiffs in this case have relied upon similar authority, w

reject. Lacking a clear plain meaning of the term "interest," we turn to congressi

purpose.

The legislative history of the National Bank Act is not especially helpfu

establishing the exact scope Congress intended "interest" to have. Although Congre

considered establishing a uniform national rate of interest that the national banks

charge, it ultimately rejected the idea and designed a system "to place the nationa

in each State on precisely the same footing with individuals and persons doing busi

the State by its laws." Cong. Globe, 38th Cong., 1st Sess. 2126 (1864). The langu

interest was designed to create a mechanism for national banks to be able to charge

40

state lenders could charge for loans, so that national banks would be immune from "unfriendly State legislation." Tiffany v. National Bank of Missouri, 85 U.S. (18 409, 412 (1874).

While instructive, the legislative history does not clearly establish the intended scope of "interest" in § 85, so we will consider the section's purpose. S 85 authorizes a national bank to charge the interest allowed by the state where the is located to its customers around the country. Marquette Nat'l Bank v. First of On Serv. Corp., 439 U.S. 299, 313-18 (1978). Known as the "exportation" principle, it a bank to impose interest charges allowed by the laws of its home state on out-of-s customers. Greenwood Trust, 971 F.2d at 827. For example, the exportation princip makes it lawful for a bank located outside of Pennsylvania to impose interest charg cardholders in Pennsylvania if the bank's home state allows those charges. It does matter if those charges are unlawful under Pennsylvania law as long as the charges "interest" and thus within the scope of §§ 85 and 86.

Congress also designed § 85 to give national banks a potential advantage state banks by allowing national banks to charge interest rates higher than state b may charge, provided another lender in the state is permitted to charge that higher Tiffany, 85 U.S. at 412-13. This "most favored lender" doctrine serves the congres purposes of protecting national banks from "the hazard of unfriendly legislation by States" and of promoting the notion that "National banks have been National favorit Id. at 413; see also Fisher v. First Nat'l Bank, 548 F.2d 255, 259 (8th Cir. 1977) (explaining doctrine and exportation principle). The most favored lender doctrine' application to this case allows each defendant to charge a borrower any "interest" allowed to a lender in the defendant's home state.

The exportation principle and the most favored lender doctrine evince str congressional encouragement of national banks' lending efforts and provide powerful for the national banks to expand their lending activities. The Supreme Court noted

41

Congress' effort "to insure their taking the place of State banks."  Tiffany, 85 U.

413.  We now must determine the appropriate definition of "interest" in order to

effectuate these congressional goals.

Associates National Bank assessed Szydlik two late charges and two over-l

fees, one of each in January 1991 and one of each in October 1991.  Szydlik alleges

neither late fees or over-limit fees are permissible under Pennsylvania law, where

resides.  He claims these charges are not within § 85's definition of "interest," a

therefore federal law (i.e., § 85, with its exportation principal and most favored

doctrine) provides no authorization of the charges.  Szydlik then argues that § 85

not preempt state law with respect to these charges, and that Associates National B

to defend the state causes of action on the merits.  Associates responds that the c

are "interest," that § 85 authorizes the charges as long as any lender in the bank'

state can charge them, and that contrary state law must yield under the Supremacy C

Szydlik asserts that "interest" has at least one of three characteristics

based on the amount of the unpaid loan balance; it accrues and is measurable over t

the lender requires the charge as consideration for the loan. Interest cannot, Szy

maintains, be a contingent charge, such as "penalty" charges based on the borrower'

default.[0]

Szydlik would limit the definition of "interest" to charges in the form o

periodic percentage rates.  Were his definition to prevail, Congress' clear purpose

enacting § 85 would be undermined.  As we have explained, "Congress intended to fac

. . . a national banking system."  Marquette, 439 U.S. at 314-15 (quotations omitte

Implicit in a national banking system was the possibility that it would "impair the

---

[0]     Szydlik makes much of the distinction between contingent fees and require
with only the latter constituting interest.  We decline to recognize the distinctio
application, either form of fee can be recharacterized as the other.  For example,
characterizes late fees as contingent penalties for the borrower's failure to pay o
But late fees could equally be characterized as required fees for those borrowers w
to extend the term of their loan.

ability of States to enact effective usury laws." Id. at 318. The most favored le

doctrine and the exportation principle apply to all of a national bank's charges fo

use of its money, and the term "interest" must have a correspondingly broad reach i

to assure parity between national banks and other state lenders. The Supreme Court

formulated a useful definition in Brown v. Hiatt, 82 U.S. (15 Wall.) 177, 185 (187:

holding that interest is "the compensation . . . for the use or forbearance of mone

as damages for its detention." This definition comports with the purposes of § 85.

A narrower definition would allow states to permit certain favored lender

assess these charges while denying national banks the same privilege. As Amici for

banks argued in their brief, applying Section 85 only to periodic percentage rates

lead to an unworkable and undesirable hodgepodge of fee limits, and periodic rate

provisions, under the laws of both the bank's state and the borrower's state." Sta

often allow lenders to utilize a variety of credit card charges as an integrated pa

The Supreme Court noted this point in Marquette, 439 U.S. at 302-03, in which it di

a Nebraska law that set higher percentage rates than did Minnesota law. The Court

observed, "To compensate for the reduced [annual rate of] interest, Minnesota law p

banks to charge annual fees of up to $15 for the privilege of using a bank credit c

Id. Some states could, for example, decide to limit lenders' use of late fees if t

lenders are also imposing certain periodic rates. Szydlik's interpretation could th

result in a borrower in one of these states being subject to the periodic percentag

limits but not to the limits on other loan charges as well.

Other courts have held § 85 applicable to a broad range of charges. See,

Citizens' Nat'l Bank v. Donnell, 195 U.S. 369, 373-74 (1904) (penalty charges for l

payment); Greenwood Trust, 971 F.2d at 831 (late fees); Fisher, 548 F.2d at 258-61

advance fee); Northway Lanes v. Hackley Union Nat'l Bank & Trust Co., 464 F.2d 855,

(6th Cir. 1972) (closing costs); Cronkleton v. Hall, 66 F.2d 384, 385, 387 (8th Cir

(commission paid by lender), cert. denied, 290 U.S. 685 (1933). The treatment give

43

issue by state tribunals is also persuasive. Both the Supreme Court of California a

Supreme Court of Colorado have interpreted § 85 to apply to credit card late charge

cases whose facts parallel the consolidated actions before us.  <u>Smiley v. Citibank</u>

<u>N.A.</u>, 900 P.2d 690 (Cal. 1995); <u>Copeland v. MBNA America Bank, N.A.</u>, No. 94SC409, _

___, 1995 Colo. LEXIS 743 (Colo. Nov. 20, 1995); <u>but see</u> <u>Hunter v. Greenwood Trust</u>

No. A-103-94, ___ A.2d ___ (N.J. Nov. 28, 1995) (holding that term "interest" in §

not include late-payment fees).  These precedents demonstrate the significant weigh

authority that comports with our interpretation, and they recognize that various lo

charges often are substantively similar in their economic function to the periodic

percentage rates casually termed "interest."

Likewise, the Office of the Comptroller of the Currency, which has the

responsibility to oversee "the execution of all laws passed by Congress relating to

issue and regulation of a national currency" (including the National Bank Act), 12

§ 1 (1988), has interpreted "interest" broadly[0] in interpretive rulings and opinion

letters.[0]

---

[0]     We discuss the OCC's interpretation because of its thoughtful analysis, b
would reach the same holding without any reliance on the OCC's authority.  Therefor
need not decide how much deference to the OCC's interpretation is warranted under s
cases as <u>Clarke v. Securities Industry Ass'n</u>, 479 U.S. 388, 403-04 (1987).

[0]     <u>See</u>, <u>e.g.</u>, Letter from Richard V. Fitzgerald, Director, OCC Legal Advisor
Services Division, to David Rosenberg, Deputy Attorney General, PA (Nov. 24, 1980)
(stating that "all charges permitted or prohibited by [a national bank's home] stat
in connection with particular types of loans may be defined as 'interest'" governed
85); Letter from Robert B. Serino, Deputy Chief Counsel (Aug. 11, 1988) (OCC Interp
Letter No. 452), <u>reprinted in</u> [1988-89 Transfer Binder] Fed. Banking L. Rep. (CCH)
85,676 (concerning credit card late charges, returned check charges, and cash advan
charges); Letter from William P. Bowden, Jr., OCC Chief Counsel, 1992 WL 136390 (OC
(Feb. 4, 1992) (regarding credit card over-limit charges, late charges, and returne
charges).

We note the agencies concerned with enforcement of the other relevant sta
have issued similarly broad interpretations. <u>See</u>, <u>e.g.</u>, Letter from Douglas H. Jor
FDIC Deputy General Counsel, Opinion No. 92-47 [1992-93 Transfer Binder] Fed. Banki
Rep. (CCH) ¶ 81,534 (July 8, 1992) (regarding § 521 of DIDA); Letter from Harry Qui
Acting General Counsel, FHLBB (June 27, 1986) (regarding § 522 of DIDA).

44

In a February 17, 1995, letter from the OCC Chief Counsel, the OCC reconf

its position regarding many of the types of fees at issue here.  Letter from Julie

Williams, OCC Chief Counsel, to John L. Douglas, Alston & Bird (Feb. 17, 1995).  The

letter discusses annual fees, late charges, and over-limit charges.  Annual fees mu

within the definition of interest, the OCC states, because they "compensate the bar

other costs and risks associated with establishing and maintaining the account."  I

7.  These fees are "akin to commissions [or] closing costs," which are considered w

the scope of § 85.  <u>Id.</u>  The OCC argues that late charges are likewise a form of in

because they are compensation for the increased lending costs and risks associated

borrowers who pay late.  <u>Id.</u> at 9.  In addition, the OCC maintains that over-limit

are compensation for the increased credit risk associated with excess draws upon th

borrower's credit.  <u>Id.</u> at 11.  This interpretation accords with our view.

Congress has written a statute to allow national banks to assess charges

associated with their loans that comply with the law of the bank's home state, with

regard to the charges permitted by other states in which the banks may make loans.

definition of interest must be broad to accommodate Congress' effort.[0]  Indeed, the

---

[0]     The consequences of a broad definition are not uniformly positive.  As th
in <u>Tikkanen</u>, 801 F. Supp. at 276, commented:

> The consequence of combining a broad definition of interest with the
> exportation principle set forth in <u>Marquette</u> is that national banks
> located in states with liberal credit laws may circumvent consumer
> protection laws enacted in other states.  The exportation principle
> encourages national banks with large consumer credit operations to
> relocate to states with liberal credit laws . . . .  Moreover, . . .
> because section 85 adopts the law of the state in which a national
> bank is located, a given state's consumer protection laws are not
> preempted by a uniform national plan, but by any number of other
> states' laws.

In fact, the converse is equally possible:  A broad definition of "interest" can be
consistent with the legislative goal of consumer protection.  Lenders frequently se
characterize their charges as other than interest in an effort to circumvent usury
A narrow definition would permit such practices; a broad definition does not.  Rega
these concerns are properly addressed to Congress, not this court.

of authority is overwhelmingly on the side of an expansive definition of interest f
purposes of §85.  We must next determine whether the specific charges at issue fit
this broad definition.

We conclude that over-credit limit fees and late fees constitute interest
because they provide mechanisms to compensate the lender for the increased lending
associated with people who incur these kinds of charges.  As such, they are compens
for the "use or forbearance of money, or . . . damages for its detention."  Brown,
at 185.  We hold that the term "interest" in § 85 of the National Bank Act encompas
fees charged by Associates National Bank in this case.  See Smiley v. Citibank (S.D
N.A., 900 P.2d 690 (Cal. 1995) (reaching same conclusion).

Under the most favored lender doctrine, however, Associates National Bank
only assess late charges and over-limit fees if they are permitted of a lender in
California.  We therefore turn to California law.

Effective January 1, 1995, California permits credit card issuers to char
graduated late fee of $7 where the minimum payment due is not paid within five days
the due date, $10 where the minimum payment due is not paid within 10 days after th
date, and $15 dollars where the minimum payment due is not paid within 15 days afte
due date.  Cal. Fin. Code § 4001(a).  Once the consumer has incurred two late payme
during the preceding year, the monthly late fee can be no greater than $10 where th
minimum payment is made within five days of the due date.  Id.  The statute also
authorizes a $10 over-credit fee where the consumer exceeds his allowable balance b
lesser of $500 or 120%.  Id.

While this statute clarifies the current state of California law, it leav
the validity of pre-1995 late fees and over-credit charges.  This question was not
adequately briefed in the district court, and we will remand for its consideration.
doing so, the district court should also consider whether § 4001 could be applied

46

retroactively to validate the late fees and over-credit charges to the degree permi

the statute.  Accordingly, we will remand Szydlik for these determinations.

IV.

We shall reverse the decisions of the district courts asserting complete

preemption jurisdiction in the non-California lender cases, with instructions to re

the state courts. We shall affirm the district court on all other points except its

dismissal of the claims in Szydlik v. Associates Nat'l Bank, No. 94-3216, regarding

charges and over-limit fees charged by Associates National Bank.  We will reverse t

portion of the district court's dismissal and remand for further proceedings consis

with this opinion.
Spellman v. Meridian Bank, Nos. 94-3203/04, 94-3215/16/17/18

SCIRICA, Circuit Judge, dissenting in part
and concurring in part.


Under the majority's interpretation that the complete preemption doctrine

not provide federal jurisdiction, the courts of each state will decide the extent t

national banks are governed by the usury provisions of the National Bank Act.  Beca

Congress passed the National Bank Act in 1864, we must divine congressional intent

distance of more than one hundred years.  Nevertheless the unique history of the Na

Bank Act demonstrates Congress could not have intended the result reached by the ma

in this case.[0]  Moreover, the majority's holding creates a conflict with the Court

Appeals for the Eighth Circuit, which decided in M. Nahas & Co. v. First Nat'l Bank

F.2d 608, 612 (8th Cir. 1991), that the complete preemption doctrine applies to cla

under section 30 of the National Bank Act, 12 U.S.C. §§ 85, 86 (1994).  Because I b

Congress intended a uniform federal construction of the Act, and the majority's hol

_____

[0]"Courts, in construing a statute, may with propriety recur to the history of the t
when it was passed; and this is frequently necessary, in order to ascertain the rea
well as the meaning of particular provisions in it."  Leo Sheep Co. v. United State
U.S. 668, 669 (1979)

47

will subject the national banking system to the vagaries of the different states' interpretations, I respectfully dissent.  Compare Sherman v. Citibank (S.D.) N.A., 102 (N.J. Nov. 28, 1995) (term "interest" as used in § 85 of the National Bank Act not include late payment fees, and the National Bank Act does not preempt applicati state law); Mazaika v. Bank One, Columbus, N.A., 653 A.2d 640 (Pa. Super. 1994) (sa appeal granted, 659 A.2d 557 (Pa. 1995); with Copeland v. MBNA America Bank, N.A., 94SC409 (Colo. Nov. 20, 1995) (term "interest" as used in § 85 includes late paymen and National Bank Act preempts application of state law); Smiley v. Citbank (S.D.), 900 P.2d 690 (Cal. 1995) (same).

I.

The existence of federal question jurisdiction in this case turns on the application of the complete preemption doctrine.  The Supreme Court created this do as a corollary to the "well-pleaded complaint" rule to acknowledge that "Congress m completely pre-empt a particular area that any civil complaint raising this select of claims is necessarily federal in character."  Metropolitan Life Ins. Co. v. Tayl U.S. 58, 63-64 (1987).  When the doctrine applies, "any complaint that comes within scope of the federal cause of action necessarily 'arises under' federal law,"  Fran Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 24 (1983), for purpose removal based on federal question jurisdiction.[0]

---

[0] The Supreme Court has found complete preemption for claims alleging a breach of a collective bargaining agreement that fall under § 301 of the Labor Management Relat Act ("LMRA"), 29 U.S.C. § 185 (1988), see Avco Corp. v. Aero Lodge No. 735, 390 U.S (1968), and for claims for benefits or enforcement of rights under the Employee Ret Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (1988), see Metropolitan I 481 U.S. at 63-67.  The Supreme Court implicitly found complete preemption in Oneid Indian Nation v. County of Oneida, 414 U.S. 661, 675 (1974), based on the exclusive application of federal law to claims regarding tribal rights to Indian lands. Id. a see Caterpillar Inc. v. Williams, 482 U.S. 386, 393 n.8 (1987) (observing the Court implicit use of complete preemption in Oneida).

The courts of appeals have gradually expanded the reach of the complete preemption doctrine.  See, e.g., M. Nahas & Co. v. First Nat'l Bank, 930 F.2d 608, (8th Cir. 1991) (holding complete preemption applies to § 85 and § 86 of the Nation

48

We have addressed the complete preemption doctrine in several cases and h[as]
established a two-part test to determine when an area of law is completely preempte[d].
First, the federal statute at issue must contain "civil enforcement provisions with[in the]
scope of which the plaintiff's state claim falls." Railway Labor Executives Ass'n v[.]
Pittsburgh & Lake Erie R.R. Co., 858 F.2d 936, 942 (3d Cir. 1988) (citing Franchise[]
463 U.S. at 24, 26). Second, there must be "affirmative evidence of a congressiona[l]
intent to permit removal despite the plaintiff's exclusive reliance on state law."
Allstate Ins. Co. v. 65 Sec. Plan, 879 F.2d 90, 93 (3d Cir. 1989).

## A.

As the majority notes, the first prong of the complete preemption test re[quires]
a comparison between the federal statute's enforcement provisions and the nature of [the]
plaintiffs' claims. We must ask if the National Bank Act's and DIDA's civil enforc[ement]
provisions, 12 U.S.C. §§ 86 and 1831d, govern the same interests plaintiffs seek to
vindicate in their suits. See Allstate Ins., 879 F.2d at 93-94.

Section 86 of the National Bank Act, the civil enforcement provision for [the]
recovery of excessive interest and impermissible loan fees charged by national bank[s, is]
the exclusive remedy for borrowers to enforce the terms of § 85 of the National Ba[nk]
M. Nahas, 930 F.2d at 610; McCollum v. Hamilton Nat'l Bank, 303 U.S. 245, 248 (1938[)]

---

Act, 12 U.S.C. §§ 85 & 86); Rosciszewski v. Arete Assocs., 1 F.3d 225, 232-33 (4th [Cir.]
1993) (holding complete preemption applies to § 301 of the Copyright Act, 17 U.S.C. [§]
301); Trans World Airlines v. Mattox, 897 F.2d 773, 787 (5th Cir.) (holding complet[e]
preemption applies to § 105(a)(1) of the Airline Deregulation Act, 49 U.S.C. § 1305[),]
cert. denied, 498 U.S. 926 (1990). They have also placed limits on its applicatio[n. See,]
e.g., Hurt v. Dow Chem. Co., 963 F.2d 1142, 1144-45 (8th Cir. 1992) (refusing to ex[tend]
the complete preemption doctrine to the Federal Insecticide, Fungicide, and Rodenti[cide]
Act, 7 U.S.C. §§136-136y); Robinson v. Michigan Consol. Gas Co., 918 F.2d 579, 585 [(6th]
Cir. 1990) (refusing to extend the complete preemption doctrine to suits against tr[ustees]
in bankruptcy); Aaron v. National Union Fire Ins. Co., 876 F.2d 1157, 1166 (5th Cir[.)]
(refusing to extend the complete preemption doctrine to § 5 of the Longshore and Ha[rbor]
Workers' Compensation Act, 33 U.S.C. §905), cert. denied, 493 U.S. 1074 (1990).
[0]The text of 12 U.S.C. §§ 85-86 is set forth in the majority opinion. See Majority[]
Opinion at 17-18 & n.10.

49

Evans v. National Bank, 251 U.S. 108, 109, 114 (1919); Farmers' & Mechanics' Nat'l

Dearing, 91 U.S. 29, 34-35 (1875).  Section 85 establishes the rates of interest a

national bank can charge its customers.

Section 521 of DIDA, the civil enforcement provision for individuals char

excessive interest by federally insured state banks, is identical to § 86 in all ma

respects.[0] Cf. Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 826 & n.7 (1st C

1992) (noting the identity of language between the first part of § 521 of DIDA and

the National Bank Act), cert. denied, 113 S. Ct. 974 (1993).  Congress wrote § 521

the same scope as § 86 and to provide redress for the same type of conduct.

The interests the cardholders seek to vindicate are precisely those prote

both federal statutes.  Plaintiffs' state law causes of action rest on allegations

national banks and federally insured state-chartered banks charged impermissible fe

connection with credit card loans. Section 86 of the National Bank Act and § 521 of

govern recovery of impermissible loan fees from such banks.  Because the redress so

the plaintiffs falls within the scope of the enforcement provisions of the federal

statutes, the first prong of the test for complete preemption is satisfied.

B.

Under the second prong of the complete preemption analysis, we must exami

congressional intent.  Congress has broad authority to control the jurisdiction of

lower federal courts.  See Kline v. Burke Constr. Co., 260 U.S. 226, 233-34 (1922)

(observing that, aside from the Supreme Court, "[e]very other court created by the

government derives its jurisdiction wholly from the authority of Congress"). Accord

congressional intent is the "touchstone" for an analysis of the scope of removal

jurisdiction.  Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987).  The

---

[0]The text of § 521 of DIDA, 12 U.S.C. § 1831d, is set forth in the majority opinion
Majority Opinion at 18-19 & n.11.

50

existence of removal jurisdiction in a particular case turns on whether Congress ha

granted it.

We have suggested that complete preemption requires "affirmative evidence

congressional intent to permit removal despite the plaintiff's exclusive reliance o

law." Allstate Ins., 879 F.2d at 93; see also Goepel v. National Postal Mail Handle

Union, 36 F.3d 306, 311 (3d Cir. 1994) (formulating the requirement as one of clear

congressional intent), cert. denied, 115 S. Ct. 1691 (1995); Krashna v. Oliver Real

Inc., 895 F.2d 111, 114 (3d Cir. 1990) (same); Railway Labor, 858 F.2d at 942 (same

because the claim of complete preemption in each of our prior cases has foundered o

first prong of our test, we have never had occasion to elaborate upon the requireme

the second prong. See Goepel, 36 F.3d at 312–13; Krashna, 895 F.2d at 115; Allstat

879 F.2d at 94; Railway Labor, 858 F.2d at 942. Thus, while we have described the

prong of the test in dictum, until today we have never issued a holding based upon

At oral argument, defendants suggested that the test for complete preempt

should focus solely on whether Congress has created an exclusive federal remedy, an

our precedent requiring a showing of specific Congressional intent to allow removal

be abandoned. Defendants are correct that the Supreme Court's holdings in Avco Cor

Aero Lodge No. 735, 390 U.S. 557 (1968), and Franchise Tax Bd. v. Construction Labo

Vacation Trust, 463 U.S. 1 (1983), cannot be explained under our two part test. Av

Corp. focused solely on the preemption of state law by § 301 of the LMRA and conclu

that basis that "[r]emoval is but one aspect of the primacy of the federal judiciar

deciding questions of federal law." 390 U.S. at 560. It did not ask whether Congr

specifically intended to allow removal of § 301 actions to federal court. Likewise

Franchise Tax, the Court, without considering the lack of specific congressional in

allow removal, found no complete preemption because § 514(b)(2)(A) of ERISA did not

provide an exclusive federal remedy. 463 U.S. at 25–26.

51

The Supreme Court has addressed the scope of the congressional intent requirement only in Metropolitan Life, 481 U.S. at 64-66, and there, only in genera[l] terms. The courts of appeals have been left to determine the necessary quantum of congressional intent. Not surprisingly, the circuits have taken different approach[es]. Compare Rosciszewski v. Arete Assocs., 1 F.3d 225, 232-33 (4th Cir. 1993) (finding congressional intent to have copyright litigation take place in federal court from [grant] of exclusive jurisdiction); M. Nahas, 930 F.2d at 612 (finding congressional intent [to create] complete preemption based on Congress' creation of an exclusive federal remedy in § [86 of] the National Bank Act); Trans World Airlines v. Mattox, 897 F.2d 773, 787 (5th Cir. [1990]) (finding congressional intent to create complete preemption based on Congress' desi[re to] maintain uniformity in the law and to "avoid the confusion and burdens that would r[esult] if interstate and international airlines were required to respond to standards of individual states"), cert. denied, 498 U.S. 926 (1990); with Hurt v. Dow Chemical C[o., 963] F.2d 1142, 1145 (8th Cir. 1992) (holding no complete preemption where the plaintiff[s would] not have had a cause of action under FIFRA, especially when there is no other indic[ation] of Congress' intent to create complete preemption); Aaron v. National Union Fire In[s. Co.,] 876 F.2d 1157, 1165-66 (5th Cir. 1989) ("[T]he parties have not pointed to, nor hav[e we] found, any expression in the statute or the legislative history of congressional in[tent to] apply something similar to the Avco exception."), cert. denied, 493 U.S. 1074 (1990[)].

---

[0]The genesis of our requirement of a showing of specific congressional intent to al[low] removal is Justice Brennan's concurring opinion in Metropolitan Life, 481 U.S. at 6[7.] See Railway Labor, 858 F.2d at 941 (relying on Justice Brennan's concurring opinion[).] While the majority in Metropolitan Life did not examine the quantum of evidence nec[essary] to establish congressional intent to give a statute completely preemptive force, Ju[stice] Brennan wrote separately to emphasize that he would require a clear manifestation o[f] congressional intent to allow removal. Id.

I understand the desire to interpret the complete preemption doctrine narrowly [in] order to prevent improvident removals to federal court, but I believe we should exa[mine] congressional intent in a broader fashion, particularly when dealing with statutes [passed] before the Court's decision in Metropolitan Life. Our inquiry into congressional i[ntent] should focus on the importance that Congress ascribed to insuring a uniform interpr[etation] of federal law. Where Congress clearly desired to displace state law by creating a[n]

Of course the clearest case of a satisfactory indication of congressional

is where Congress provides jurisdictional language like that in § 301 of the LMRA.

Metropolitan Life, 481 U.S. at 65 (finding complete preemption because the jurisdic

subsection of ERISA's civil enforcement provision closely parallels § 301's languag

But the Court made clear that ERISA provided unusually clear evidence of congressio

intent, stating, "[n]o more specific reference to the Avco rule can be expected," i

66, and "[i]n the absence of explicit direction from Congress, this question would

close one." Id. at 64. These statements leave open the possibility that there are

instances where congressional intent is less clear but nevertheless sufficient to s

a finding of complete preemption.

Congress wrote the National Bank Act in 1864, long before the "well-plead

complaint" rule and the complete preemption doctrine were enunciated. We could no

expect the Congress which enacted the National Bank Act to have discussed the feder

question jurisdiction or removal implications of §§ 85 and 86, since neither genera

---

exclusive federal remedy and stressed the importance of a uniform interpretation of
law, I believe we should find complete preemption.
In Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987), the Supreme Court
the jurisdictional language in section 502(f) of ERISA:

> The district courts of the United States shall have jurisdiction,
> without respect to the amount in controversy or the citizenship of the
> parties, to grant the relief provided for in subsection (a) of this
> section in any action.

Plaintiffs argue the fact that most National Bank Act claims were historically lit
in state courts "refutes any finding that Congress clearly intended the type of exc
federal jurisdiction necessary for a finding of complete preemption." Appellants' C
Br. at 22. This argument overlooks the essential distinction between exclusive fed
jurisdiction and an exclusive federal remedy. Complete preemption does not oust th
court of jurisdiction if the defendant is satisfied to stay there. See Avco Corp.
Lodge No. 735, 390 U.S. 557, 560 n.2 (1968) (observing state courts may retain
jurisdiction over cases brought under § 301 of the LMRA). Indeed, the two statutes
form the core of the complete preemption doctrine, the LMRA and ERISA, allow concur
jurisdiction. Rosciszewski, 1 F.3d at 232. Both statutes, however, do not allow
concurrent application of federal and state law.

federal question jurisdiction nor general removal power existed in 1864.[0]  Under th

circumstances, the majority's requirement of an explicit showing of congressional i

to allow removal is too strict.  Instead we should look to less direct evidence of

Congress intended regarding the role of federal courts in enforcing the National Ba

Act.[0]  See Trans World Airlines v. Mattox, 897 F.2d at 787 (finding complete preemp

based on Congress' desire to maintain uniformity in the law).

---

[0]Congress granted general original jurisdiction over federal question cases and pro
for general removal power in 1875. Judiciary Act of 1875, §§ 1, 2, 18 Stat. 470.
[0]We discussed one type of indirect evidence of congressional intent in Goepel v. Na
Postal Mail Handlers Union, 36 F.3d 306, 315 (3d Cir. 1994), where we observed that
"Congress must manifest its intent to authorize the removal of a state claim by ena
federal statute containing an enforcement provision vindicating the same interest a
state claim."  Of course, a civil enforcement provision could not by itself constit
sufficient evidence of congressional intent because if it did the two-pronged test
collapse into one, and in Goepel we specifically re-emphasized the existence of the
pronged test for complete preemption, id. at 311.  Thus, the quoted passage merely
suggests that a civil enforcement provision can provide a preliminary indication of
congressional intent and that the two-prongs of the analysis inform each other even
they are distinct inquiries.  I consider it instructive, therefore, that in enactin
National Bank Act Congress included civil enforcement provisions which vindicate th
interests at issue here.

1.

Accordingly, I believe it is useful to place the current dispute within t

proper historical context.  Congress passed the National Bank Act of 1863, 12 Stat.

and replaced it with the National Bank Act of 1864, 13 Stat. 99, in the midst of th

exigencies imposed by the Civil War.  The statute created the current system of nat

banks and established the limitations on interest charges that we must construe her

A thorough understanding of the history of our banking system is incomple

without reference to the earlier debates over the First and Second Banks of the Uni

States of America. Federalists in the young republic were in favor of a national ba

perceived its utility as a source of capital both for the new government and for th

general economy.  See, e.g., Alexander Hamilton, Treasury Report on a National Bank

13, 1790), reprinted in 1 Documentary History of Banking and Currency in the United

230, 231–33 (Herman E. Krooss ed., 1969). States' rights advocates and Republicans,

however, saw the national bank as a threat to liberty and as an aggrandizement of f

power beyond the boundaries set by the Constitution. Thomas Jefferson, Opinion on t

Constitutionality of a National Bank (Feb. 15, 1791), reprinted in The Portable Tho

Jefferson 261, 262 (Merrill D. Peterson ed., 1975).

The Federalists, led by Alexander Hamilton, won the opening round of this

debate, and the First Bank of the United States was given a twenty-year charter beg

in 1791.  Bank Act of 1791, § 3, 1 Stat. 191, 192.  The bank was rechartered in 181

the Second Bank of the United States, again for a twenty-year period.  Bank Act of

7, 3 Stat. 266, 269.  To the extent that the power of Congress to establish the ban

been doubted, those doubts were erased in 1819, when the Supreme Court firmly establ

the constitutionality of the national bank in McCulloch v. Maryland, 17 U.S. (4 Whe

316 (1819).  In McCulloch the Supreme Court also enunciated a strong view of the fe

government, observing that its supremacy over the states is a "great principle" whi

"entirely pervades the constitution."  Id. at 426.

55

Congress again passed a bill to recharter the bank in July of 1832, but A

Jackson vetoed it.  John J. Knox, A History of Banking in the United States 69 (Aug

M. Kelley pub., 1969) (1903).  His main argument against the bank was that it repre

an unreasonable expansion of the federal government and monied interests at the exp

local interests.  Bray Hammond, Banks and Politics in America from the Revolution t

Civil War 405-06 (1957) (hereinafter Banks and Politics).  The charter for the bank

expired in 1836, and the federal government began to remove its deposits from the b

Knox, supra, at 70-71.

After the passage of the Independent Treasury Act of 1846, 9 Stat. 59, th

federal government kept substantially all of its money in its own vaults.  Bray Ham

Sovereignty and an Empty Purse: Banks and Politics in the Civil War 18-19 (1970)

(hereinafter Empty Purse).  This system was still in place at the start of the Civi

Id. at 20.  It was a system which "had the . . . effect of stunting federal powers

. . . rested on the fallacies that government lay outside the economy, that banking

not a monetary function, and that the federal sovereignty had no constitutional

responsibility for it."  Id. at 22.

As secession and the Civil War challenged the national government's survi

the inadequacies of the Independent Treasury system were placed in stark relief.  I

24.  By 1861, a large number of banks authorized by individual states were issuing

notes for circulation.  Id. at 291.  This state system of issuing banks was barely

functional, lacking reliability and uniformity.  The Union's military setbacks, com

with dire need for more stable financing, led to a movement to establish a uniform

national currency, which culminated in the passage of the National Bank Act of 1863

at 296; The National Bank Act of 1863, 12 Stat. 665.  This act was replaced by the

National Bank Act of 1864, 13 Stat. 99, but the Act of 1864 left the principal prov

of the first law substantially in place.

56

The National Bank Act thus represents the culmination of the debate regar[ding] the proper role of the federal government in the banking system.  It has been sugge[sted] that the Act created a "revolutionary change . . . in the relative powers of the st[ates] and the federal government."  Empty Purse, supra, at 333.  This may overstate the c[ase] especially in comparison with the impact wrought by the Reconstruction Amendments. [It] is clear that the National Bank Act was a significant exercise of congressional aut[hority] intended by Congress to alter federal-state relations.

The debate on the passage of the Act of 1863 illuminates the views of som[e] members of Congress.  Senator Sherman, sponsor of the bill, argued that a motive fo[r] passage was to "promote a sentiment of nationality."  Cong. Globe, 37th Cong., 3d S[ess.] 843 (1863).  He also suggested the new currency and system for establishing it "if [given] a fair trial, a fair experiment, will gradually absorb all the State banks, without[ ] deranging the currency of the country or destroying the value of the property of [ ] stockholders in banks."  Id.

The national currency system was designed to cure the worst ills of the s[tate] banks, but did not eliminate the state banks.  Indeed, at the time, there was consi[derable] doubt that Congress had the power to regulate state banks directly, let alone to el[iminate] them.  Henry N. Butler & Jonathan R. Macey, The Myth of Competition in the Dual Ban[king] System, 73 Cornell L. Rev. 677, 682 (1988). For example, during a discussion of a p[roposed] amendment to the National Bank Act that would have barred state banks from issuing [a] bank note not already in circulation, Senator Sherman asked, "[W]here is the [ ] constitutional power to do it?"  Cong. Globe, 38th Cong., 1st Sess. 2175 (1864).

But it was clear Congress had the authority to charter national banks. [ ] McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).  Even without eliminating sta[te] banks by statute, Congress thought they would disappear as the state banks exchange[d] state charters for federal charters.  Congress believed that "a dual banking system[ would] exist only during a brief transition period."  Butler & Macey, supra, at 681; see a[lso]

57

John W. Million, The Debate on the National Bank Act of 1863, 2 J. Pol. Econ. 251, (1894) ("Nothing can be more obvious from the debates than that the national system supersede the system of state banks."). In the debates over the National Bank Act, members of Congress frequently expressed their belief that the state banks would disappear. See, e.g., Cong. Globe, 38th Cong., 1st Sess. 2145 (1864) (Senator Sher remarking that the state banks would be absorbed); id. at 1869 (Senator Wilson rema that a dual system of state and national banks should not continue); id. at 1892 (S Johnson stating that the national banking system was designed to supplant the state system). When in fact most state banks did not seek to convert to nationally chart banks, Congress imposed a punitive tax on state bank notes in an effort to ruin the banking system. Butler & Macey, supra, at 681. This effort failed, however, as th banks continued to thrive. Empty Purse, supra, at 297.

Against this backdrop, Congress enacted the provision on usury in section the National Bank Act of 1864, 12 U.S.C. §§ 85, 86. The historical context demonst that Congress perceived the enactment of the National Bank Act as essential to the survival of the republic and believed it equally essential to establish a national system that was independent of potentially destructive state impulses. See, e.g., Globe, 38th Cong., 1st Sess. 1451 (1864) (Representative Hooper, remarking "I belie existence of the nation is at stake upon this issue; that the present necessity red the use of every legitimate means to sustain the credit of the Government . . . . appeal to the members of the House, and I ask them if they can excuse themselves . they sacrifice these great interests . . . to the comparatively petty interests of banking.").

2.

The Supreme Court has described Congress' intent in passing §§ 85 and 86 National Bank Act. In Tiffany v. National Bank, 85 U.S. (18 Wall.) 409, 412–13 (18 the Court observed that Congress passed the interest provisions "to give [national

a firm footing in the different States where they might be located."  Id. at 412.

power to impose the same interest charges that state institutions were allowed to i

"was considered indispensable to protect [national banks] against possible unfrien

State legislation."  Id.  Congress did not intend, the Court continued, "to expose

[national banks] to the hazard of unfriendly legislation by the States, or to ruino

competition with State banks."  Id. at 413.  The Supreme Court made clear the

congressional purpose was to enable national banks to resist potential state paroch

Congressional intent can also be gleaned from the fact that § 86 provides

exclusive remedy for usury claims against national banks.  Evans, 251 U.S. at 109,

---

The Supreme Court has observed that state law continues to play an important role
regulating national banks' behavior:

> National banks "are subject to the laws of the State, and are governed
> in their daily course of business far more by the laws of the State
> than of the nation.  All their contracts are governed and construed by
> state laws.  Their acquisition and transfer of property, their right
> to collect their debts, and their liability to be sued for debts, are
> all based on state law.  It is only when the state law incapacitates
> the banks from discharging their duties to the government that it
> becomes unconstitutional."

McClellan v. Chipman, 164 U.S. 347, 356-57 (1896) (quoting National Bank v. Commonw
76 U.S. (9 Wall.) 353, 362 (1870)).  The first sentence appears at first glance to
narrow scope for the operation of national banking laws.  But the Court was simply
observing that state laws in general apply to national banks, just as federal offic
"subject to all the laws of the State which affect [their] family or social relatio
[their] property, and [they are] liable to punishment for crime . . . ."  National
76 U.S. at 362. The fact that federal law does not replace state contract and prope
does little to advance our inquiry regarding the preemptive effect of the National
Act's usury provision.

Far more important to our inquiry is the broad reading the Supreme Court
specifically given to section 30 of the National Bank Act with regard to its preemp
effect.  As the Court stated, "In any view that can be taken of the thirtieth secti
power to supplement it by State legislation is conferred neither expressly nor by
implication.  There is nothing which gives support to such a suggestion."  Farmers'
Mechanics' Nat'l Bank v. Dearing, 91 U.S. 29, 35 (1875).  We are concerned here wit
preemptive effect of the usury provision in the National Bank Act, not with the rol
law may or may not play in regulating the banks' conduct in other areas.

That the federal remedy is exclusive and occupies the field may not provide a dire
answer to our inquiry.  As the Court of Appeals for the Seventh Circuit has noted:

59

<u>Dearing</u>, 91 U.S. at 34-35.  Congress intended through the creation of this exclusiv

federal remedy to "prevent the application of overly-punitive state law usury penal

against national banks."  <u>M. Nahas</u>, 930 F.2d at 612.  Further, the remedy for usury

86 "preempts the field and leaves no room for varying state penalties."  <u>First Nat'</u>

<u>v. Nowlin</u>, 509 F.2d 872, 881 (8th Cir. 1975); <u>see also</u> <u>McCollum</u>, 303 U.S. at 247-48

(holding the National Bank Act sections completely define the right to recover pena

for usurious interest); <u>Barnet v. National Bank</u>, 98 U.S. 555, 558 (1879) (observing

federal penalty provisions for usury occupy the field to the exclusion of state usu

statutes when national banks are involved).

3.

As I have noted, Congress did not seek immediately to eliminate the state

banking system, but rather believed the state banks would voluntarily seek national

charters.  <u>See</u> <u>supra</u> part I.B.1.  Members of Congress anticipated state banks would

disappear as national bank charters became universal.  The Congress that enacted th

National Bank Act did not expect competition between state and federal law over usu

claims against national banks because those claims ultimately were to be governed

exclusively by federal law.  <u>See, e.g.,</u> <u>Dearing</u>, 91 U.S. at 35 ("In any view that c

---

> [A]sking whether federal law provides a defense or occupies the field
> may just be another way of asking whether the issue of federal
> preemption shall be decided by a state or a federal court, and perhaps
> that question should be asked directly, without taking the essentially
> question-begging step of asking whether the federal statute occupies
> the field.  If the federal statute is deemed merely to create a
> defense, the state court decides whether it is a good defense; if it
> is deemed to occupy the field, the federal court decides whether the
> plaintiff has a cause of action.

<u>Graf v. Elgin, J. & E. R. Co.</u>, 790 F.2d 1341, 1345 (7th Cir. 1986).  Despite this
perceptive observation of the essential nature of the complete preemption inquiry,
still must conduct the inquiry following the analysis established by our circuit an
Supreme Court's precedent.

60

taken of the thirtieth section, the power to supplement it by State legislation is

conferred neither expressly nor by implication.").

All of this evidence demonstrates that Congress intended to have usury cl

against national banks governed by a body of federal law which the federal courts w

apply. Unlike the standard preemption defense case where there is no removal jurisd

because the case is really a state case with a federal defense, here we are faced w

federal case in state wrapping paper."  Graf v. Elgin, J. & E. R. Co., 790 F.2d at

Accordingly, the claims at issue must arise under federal rather than state law, an

removal is proper.

An analysis of § 521 of DIDA leads to the same result. The particular his

context I find persuasive for the National Bank Act does not apply to DIDA, which w

passed in 1980.  But I agree with the Court of Appeals for the First Circuit, which

[0]In Trans World Airlines v. Mattox, 897 F.2d 773 (5th Cir. 1990), the court address
whether § 105 of the Airline Deregulation Act of 1978, 49 U.S.C. § 1305 (1988), had
complete preemptive effect over a state court action for deceptive advertising.  Se
105 is not a civil enforcement provision, but is an express preemption provision of
laws relating to "rates, routes, or services of any air carrier."  49 U.S.C. §1305(

The court was persuaded by the legislative history that Congress intended
section to have complete preemptive effect. Mattox, 897 F.2d at 787.  The House Rep
stated:

> If there was no Federal regulation, the states might begin to regulate
> these areas, and the regulations could vary from state to state.  This
> would be confusing and burdensome to airline passengers, as well as to
> the airlines.

H.R. Rep. No. 793, 98th Cong., 2d Sess. 4 (1984), reprinted in 1984 U.S.C.C.A.N. 28
2860.  The court interpreted this and similar passages to indicate Congress' desire
maintain uniformity and to avoid the confusion and burdens that would result if int
and international airlines were required to respond to standards of individual stat
Mattox, 897 F.2d at 787.

The analogy to the present case is inexact, but illustrative.  Congress i
national banks, like airlines, to be governed by uniform federal law in certain are
One of these areas is usury claims against national banks.  Congress adopted state
interest limitations in order to place national banks on an even footing with state
Congress knew this would allow a variety of interest rates to exist but neverthele
wanted uniform federal interpretation of usury claims against national banks.

61

"[t]he historical record clearly requires a court to read the parallel provisions o

and the Bank Act in pari materia." Greenwood Trust, 971 F.2d at 827. Section 521

was specifically intended to have congruent scope with the National Bank Act with r

to the coverage of § 85. Id. In order to effectuate this purpose, we must give

equivalent jurisdictional reach to the two sections and their civil enforcement

provisions. Accord Hill v. Chemical Bank, 799 F. Supp. 948, 952 (D. Minn. 1992) (f

complete preemption in §521 of DIDA).

Removal jurisdiction is generally to be construed narrowly, see La Chemis

Lacoste v. Alligator Co., 506 F.2d 339, 344 (3d Cir. 1974), cert. denied, 421 U.S.

(1975), and application of the complete preemption doctrine should be carefully

circumscribed, Railway Labor, 858 F.2d at 940. But I am persuaded that complete

preemption is appropriate because of the unique combination of the statute's histor

the strong congressional desire for uniform treatment of national banks and of fede

insured state-chartered banks. Tiffany, 85 U.S. at 412. I believe the district co

properly exercised its removal jurisdiction over these cases. Accord M. Nahas, 930

at 612; Watson v. First Union Nat'l Bank, 837 F. Supp. 146, 149 (D.S.C. 1993). But

Copeland v. MBNA America, N.A., 820 F. Supp. 537, 541 (D. Colo. 1993) (finding no c

preemption in §§ 85 and 86 of the National Bank Act); Donald v. Golden 1 Credit Uni

F. Supp. 1394, 1403 (E.D. Cal. 1993) (finding no complete preemption in § 523 of DI

II.

I join part III of the majority opinion, but because I do not agree with

majority's conclusion in part II that jurisdiction is improper under the complete

preemption doctrine, I respectfully dissent.